# Wytheville.

## Trustees, &c., v. Guthrie et als.

### June 13th, 1889.

| 86 | 125 |
| 94 | 568 |
| 86 | 125 |
| 106 | 717 |
| 106 | 718 |
| 106 | 721 |
| 86 | 125 |
| 107 | 85 |
| 107 | 542 |

1. Corporations—*Legacies—Uncertainty—Description of legatee—Parol proof.*—In order to secure a legacy to a corporation for purposes within scope of its powers and duties, parol evidence of testator's surroundings is admissible to explain a slight discrepancy in the description of the legatee. *Rey's Ex'or* v. *Rowzie*, 25 Gratt., 605.

2. Idem—*Charitable bequests—Case at bar.*—A corporation styled the "Trustees of the General Assembly of the Presbyterian Church in the United States," with power to acquire property to carry on foreign missions, etc., to establish committees, etc., deemed branches, for its purposes, with a provision that any bequest to the corporation for any such committees, etc., should pass to said trustees, created a committee called the "Executive Committee of Foreign Missions," commonly known as the "Board of Foreign Missions," and its executive officer as "the secretary," and the corporation itself, as the "Southern Presbyterian Church." In a suit to construe a will leaving a legacy to "the secretary of the board of foreign missions of the Presbyterian Church in the United States," and known as "Southern Presbyterian Church," it was proved by parol, that testator had been a member and elder in a Presbyterian church part of the corporation, specially interested in foreign missions, and had said he meant to leave a legacy for that cause. Held: The legacy was not void for uncertainty of the beneficiary, but should pass to the corporation for the use of the executive committee of foreign missions.

3. Religious corporations—*Constitution.*—The creation of such corporation was not the incorporation of a church or religious denomination, which is forbidden by ¿ 17, art. 5, Va. Const., but which provides that the legislature "may secure the title to church property."

4. Religious Use—*Public policy.*—The legislation of this State has never exhibited any hostility to bequests for religious uses.

5. Cases reviewed.—*Baptist Association* v. *Hart*, 4 Wheaton, 1, disapproved; *Gallego* v. *Attorney-General*, 3 Leigh, 450, overruled; *Vidal* v. *Girard*, 2 Howard, 127, approved.

6. Equitable jurisdiction and relief—*Charitable uses—Common law—43 Elizabeth—Act of* 1839.—At common law, chancery courts had jurisdiction to enforce bequests for charitable uses. Statute of 43 Elizabeth did not confer such jurisdiction, but only created an auxiliary remedy by commission, &c. Said statute was local, and never in force here. But if it was general in its operation in some respects, it was not repealed by the act of 1792, but in those respects was preserved by the saving clause of that act. In any event, the act of 1839 (Code 1873, ch. 77), clearly validates and makes enforceable all gifts for such uses, subject to certain restrictions therein contained.

Heard at Staunton. Decided at Wytheville. Appeal from decree of circuit court of Augusta county, rendered June 4, 1887, in the cause of John B. Guthrie and others, complainants, and Hugh G. Guthrie's executors, defendants.

*W. W. Henry* and *A. F. Robertson*, for the appellants.

*Harrison & Tucker*, for the appellees.

Richardson, J., delivered the opinion of the court.

The bill was filed by John B. Guthrie, claiming to be an heir-at-law of Hugh G. Guthrie, deceased, on his own behalf and on behalf of the other heirs of said decedent, against the executors of said Hugh G. Guthrie, for the purpose of having a judicial construction of the will of the decedent, and especially of the ninth clause thereof, and to contest the validity of the bequest thereby made, which clause is in these words:

"After paying off all my debts and the foregoing legacies, I bequeath and will all the money left or remaining in the hands of my executors, as soon as collected, to be paid to the secretary of the board of foreign missions of the Presbyterian Church in the United States, and known as 'Southern Presbyterian Church.'"

The bill charges as to this clause "that the beneficiary therein is vague, uncertain, and unknown, and has no real existence, and never has had, and that your honor cannot create and raise up a hand where none before existed, to secure the bounty of the testator."

By a decree in the cause of December 9th, 1886, the trustees of the general assembly of the Presbyterian Church in the United States and Rev. M. H. Houston, the secretary of the committee of foreign missions of said church, were, on their petition, admitted as parties defendant, and this petition was treated as an answer to the bill, and an inquiry was at the same time ordered to ascertain who are the beneficiaries under said ninth clause, and to what person or corporation the said legacy should be decreed, with directions that, in making such enquiry, parol evidence and evidence of the surrounding circumstances be allowed, showing, or tending to show, what the testator intended by the language used in said clause.

The order of reference was executed by Commissioner John M. Kinney, who on the 4th of May, 1887, returned his report, an able and exhaustive one, and with it the evidence upon which he based his conclusions. By this report it appears that "the trustees of the general assembly of the Presbyterian Church in the United States" was a body corporate under the laws of North Carolina, and that Rev. M. H. Houston was the secretary of the committee of foreign missions of said church, and was intended to be described by the testator by the language: "The secretary of the board of foreign missions of the Presbyterian Church in the United States, and known as 'Southern Presbyterian Church,'" which was the way in which the said committee and church were popularly known in the community in which the testator lived, and therefore the commissioner concluded and reported "that the legacy bequeathed to the secretary of the board of foreign missions of the Presbyterian Church, &c., should be decreed to the trustees of the general assembly of the Presbyterian Church in the United

States, for the use and benefit of the executive committee of foreign missions of said corporation." And the commissioner also returned with his report a copy of the North Carolina act of incorporation, by which it appeared that said corporate body was empowered "to take and hold all such estate, property, and effects as may be acquired by gift, purchase, devise, or bequest, to aid and enable the said general assembly of the Presbyterian Church to undertake and carry on the work of christian education, of foreign and domestic missions, of the publication of such books, tracts, and papers as are connected with the diffusion of the religious literature and learning," &c. And by said act of incorporation it is also provided "that if the general assembly should establish any committees, boards, or agencies, for any of the purposes recited in section first, the same shall be held and deemed to be branches of this incorporation, &c. It also appears by the commissioner's report that this corporation had not reached, including this bequest of something over $4,000, the limit to which it was restricted by its charter. To this report of the commissioner the plaintiffs excepted. The cause having been matured, came on and was heard at the June term, 1887, when the said circuit court decreed "that the bequest under the will of Hugh G. Guthrie, deceased, to the secretary of the board of foreign missions of the Presbyterian Church in the United States, commonly known as the Southern Presbyterian Church, is null and void and of no effect, and that the same is properly distributable among the next of kin of said Hugh G. Guthrie, deceased, according to the laws of descent and distribution." And from that decree the trustees of the general assembly of the Presbyterian Church in the United States and M. H. Houston, secretary of the executive committee of foreign missions of the Presbyterian Church in the United States, obtained an appeal.

After a most careful consideration of the authorities and the elaborate arguments of counsel, written and oral, we arrive at the conclusion, without hesitation, that there is not room for a

rational doubt that this case is, in every essential particular, ruled by the case of the *P. Episcopal E. Society* v. *Churchman's Reps.*, 80 Va., 718, and that the decree of the court below should be reversed, as having no foundation in either law or reason.

In the Churchman case, as in this, the bequest was to a corporation, and for purposes within the scope of the corporate powers and duties, both being charitable bequests to religious uses. In that case there was a slight discrepancy in the description of the donee of the charity, but by parol proof of the circumstances surrounding the testator, his meaning and intention was made clear, and this it is competent to do in such cases. See *Roy's Ex'or* v. *Rowzic*, 25th Gratt., 605.

The same defect exists in the present case. The language of the testator is: "After paying off all my debts and the foregoing legacies, I bequeath and will all the money left or remaining in the hands of my executors, as soon as collected, to be paid to the secretary of the Board of Foreign Missions of the Presbyterian Church in the United States, and known as ' Southern Presbyterian Church.' " In reference to this clause, it is charged in the bill of complainants that the beneficiary is vague, uncertain, and unknown, and has no real existence, and never had, and that the court cannot create and raise up a hand where none before existed, to receive the testator's bounty; and upon this ground they invoke the decree of the court declaring the bequest null and void. This contention rests upon no other or higher ground than that the testator describes the beneficiary as the " secretary of the *Board* of Foreign Missions, &c.," when the true designation is " secretary of the Executive Committee of Foreign Missions," or simply " Executive Committee of Foreign Missions," of which committee the Rev. M. H. Houston is secretary.

The trustees of the general assembly of the Presbyterian church in the United States, by their president, James Hemphill, and M. H. Houston, secretary as aforesaid, answered the

bill, denying the alleged invalidity of the bequest, demonstrating that the beneficiary was thoroughly identified, and claiming the bequest as due to said trustees for the use of said committee of foreign missions, all of which is made clear by Commissioner Kinney in his able and exhaustive report, which is thoroughly sustained by the evidence before him, and by the law governing the case, but which the court below unfortunately rejected, instead of adopting and making it the basis of the only proper decree that could be rendered in this case.

Commissioner Kinney, in the course of an able review of the testimony before him, among other things, says: " It is proven that the testator, Hugh G. Guthrie, deceased, was, for 30 years or more, a member of the congregation of ' Tinkling Springs Church,' in Augusta county, which church was a part of the Lexington Presbytery, and said Presbytery was a constituent part of the several general assemblies hereinbefore described, and is now, and was at the death of the testator, a part of the ' General Assembly of the Presbyterian Church in the United States,' and popularly known as the Presbyterian Church South or ' Southern Presbyterian Church '; that said testator was a communicant member of said Tinkling Spring church for many years, and also an elder in said church for a long time before and up to his death; that he was known to be very zealous in all church work, but *especially* interested in foreign missions, and had been heard to express his purpose to leave a bequest to that cause, and that at all times during his life, while connected with the church, he had contributed liberally to that charity."   *   *   *   The commissioner in his report, in referring to the objection, and the only objection, urged against the validity of this bequest—to-wit, its vagueness and uncertainty as to the beneficiary—says: "It is true—proven and admitted by all parties—that the chartered name of the agency of the defendant corporation, created for the purpose of conducting the work of foreign missions, is ' the Executive Committee of Foreign Missions.'   But it is equally true that every Presby-

terian knows that agency by the name used by testator—viz., 'the *Board* of Foreign Missions'—and that it was so known for many years before the incorporation in 1866. It is commonly spoken of by laymen, elders, and ministers of the church as 'the Board of Foreign Missions,' and it is proven that the executive officer of this agency is known by the same persons, and technically styled in the said charter, as 'the secretary,' so that. commissioner is of opinion, and. so finds, that this bequest is not invalid because of the mere misnomer of this agency of the defendant corporation; and, that being so, it follows that the second ground of objection—viz., that the beneficiary is so vague and uncertain as to be unknown, &c.— cannot be sustained, for the reason that the beneficiary, 'the secretary of the Board of Foreign Missions,' &c., is as well known as a person could well be designated, conceding that the 'Board' and 'the Executive Committee' are the same thing." And then the commissioner adds, and with the utmost propriety, that "commissioner cannot see how any one could have the slightest difficulty in fully identifying the beneficiary under this 9th clause of the will, in the light of the evidence and surrounding circumstances."

There appears in the record a copy of the charter granted by the legislature of the state of North Carolina to " the Trustees of the General Assembly of the Presbyterian Church in the United States," which charter was accepted and ratified by said general assembly on the 11th day of February, 1866.

The first section of this charter recites "that Thomas C. Perrin (and others therein named) 'and their survivors,' &c., be, and they are hereby, constituted a body politic and corporate by the name and style of 'the Trustees of the General Assembly of the Presbyterian Church in the United States,' and by the name and style aforesaid shall be able and capable to take and hold all such estate, property, and effects as may be acquired by gift, purchase, devise, or bequest, to aid and enable the said general assembly of the Presbyterian church

to undertake and carry on the work of Christian education, of foreign and domestic missions, of the publication of such books, tracts, &c., as are connected with the diffusion of religious literature and learning, &c., &c., and all the said estate, property, and effects that shall be acquired by the said trustees and their successors at any time, shall be held, used, and disposed of according to the direction of the general assembly aforesaid, *provided* that the property, real and personal, held or possessed by said corporation shall not exceed $2,000,000."

By the 4*th section* of said charter it is enacted " that if the General Assembly shall establish any committees, boards, or agencies, for any of the purposes recited in the 1*st section*, the same shall be held and deemed to be branches of the corporation; and if any gift, grant, devise or bequest shall be made to the 'Trustees of the General Assembly of the Presbyterian Church in the United States,' for the use of such committees, boards, or agencies, the same shall be good and effectual to pass to such objects, whenever the donor, grantor, bargainor, or testator shall name the aforesaid corporation in general terms."

Thus, not only at the date of testator's death, but at the date of his will, and long anterior thereto, there was this corporate hand in existence, with lawful authority to receive and use this and like charitable donations for the purposes for which the corporation was created; one of which was to carry on the charitable work of foreign missions, and it was to aid in this work that the testator made the bequest in question.

In the answer of the trustees and of M. H. Houston, before referred to, it is said that previous to the late civil war there existed a body of Christians known as " The Presbyterian Church in the United States of America," which embraced in its membership citizens of each of the United States. Their system of church government of a session for each congregation, which was composed of a minister and the elders of the congregation, a number of congregations composed a presby-

tery, and a number of Presbyteries composed a synod, usually co-extensive with state boundaries, and all of the Presbyteries constituted a general assembly, in which the whole church was represented, and which constituted a bond of union between all the churches, with power to supervise the affairs of the whole church, and to institute and direct the agencies deemed necessary and proper for the accomplishment of the church work. In furtherance of the work of the church, the General Assembly, at an early day, committed parts of its work to certain members selected from time to time for the purpose, and constituted into boards, among which was a board of foreign missions, having charge of the work of missions in foreign lands.

Upon the breaking out of the late war, the Presbyterians within the bounds of the southern states composing the Confederacy, together with the Presbyterians of Potomac and Winchester, previously belonging to the Synod of Baltimore, determined to separate from "The Presbyterian Church in the United States of America," and sent commissioners to an assembly which met in Augusta, Georgia, on 4th December, 1861, and organized under the name of "The General Assembly of the Presbyterian Church in the Confederate States of America." At the end of the war this body, at its session in Macon, Georgia, commencing 14th December, 1865, changed the name of the church it represented to "The Presbyterian Church in the United States," and the said church, since its said corporation in 1861, has been popularly known as "The Presbyterian Church, South," or "The Southern Presbyterian Church," and "The Presbyterian Church in the United States of America," from which it separated, has been known as "The Presbyterian Church, North," or "The Northern Presbyterian Church."

At the said meeting in Augusta, Georgia, in December, 1861, "the General Assembly of the Presbyterian Church in the Confederate States of America" determined, among other

things, upon "the organization of a prominent agency for conducting foreign missions," and in pursuance thereof—

"Resolved, That this General Assembly proceed to appoint an executive committee, with its proper officers, to carry on this work, and that the character and functions of this committee be comprised in the following articles as its constitution—viz.:

"Art. 1st. This committee shall be known as the Executive Committee of Foreign Missions of the Presbyterian Church in the Confederate States of America; it shall consist of a secretary, who shall be styled "the Secretary of Foreign Missions,' and who shall be the committee's organ of communication with the assembly, and with all portions of the work entrusted to the committee," &c., &c.     *     *     *

That upon the change of the name of the church in 1865 there was a corresponding change in the name of this committee, but as the members of the Presbyterian church had been accustomed to call the agencies of the church, before the separation, "boards," the corresponding agencies of the southern church, afterwards, were frequently called, and were popularly known, by the name of "boards," instead of "executive committees," the two being substantially the same thing.

In the light of these facts, averred to have been taken from the minutes of the general assembly of the Presbyterian church, South, and which are in no way controverted, the contention, and the only one raised by the bill, that the bequest in question must be treated as null and void, because of a vagueness and uncertainty as to the beneficiary, dwindles into utter insignificance. And this being the only question raised by the pleadings and evidence in the cause, the case might appropriately end at this point, with a decree reversing the decree of the court below and establishing the validity of the bequest. But in the argument here, new propositions are advanced, and they are both novel and untenable. It seems to be conceded by

counsel for the appellees that the bequest in question is one to
the executive committee of foreign missions of the Presbyte-
rian church in the United States, and is, therefore, a bequest
to the corporation chartered by the legislature of North Caro-
lina. This proposition no one will deny; but it is further
insisted, and with apparent earnestness, that in incorporating
the trustees of the general assembly of the Presbyterian church
in the United States, the legislature of North Carolina, in effect,
incorporated the southern Presbyterian church; that such a
corporation is repugnant to article 5, section 17, of the consti-
tution of Virginia, and is against the policy of her laws.

The provision of the constitution referred to, reads: " The
general assembly shall not grant a charter of incorporation to
any church or religious denomination, but may secure the title
to church property to an extent to be limited by law."

One of the counsel for the appellant corporation (Mr. Henry),
in his printed argument, gives a correct and valuable historical
review of the legislation in Virginia bearing upon and truly
interpreting this provision in our constitution. He says:
" While Virginia was a colony, the Protestant Episcopal church
of England was established by law, and her vestries exercised
corporate powers. The convention which declared Virginia
independent, adopted, on the 12th of June, 1776, a bill of rights
as the foundation of her government, the 16th section of which
declares 'all men are equally entitled to the free exercise of
religion according to the dictates of conscience.' Subsequently,
by a series of acts which need not be mentioned in detail, the
disestablishment of the Episcopal church was made complete,
as will be shown by the acts passed January 24th, 1799, and
12th January, 1802, which will be found in the Code of 1819,
Vol. I., page 78, &c.

" The act of January 24th, 1799, repeals all the acts on the
statute books relating to the Episcopal church, and declares
the act for establishing religious freedom, passed December 16,
1785, to be a true exposition of the principles of the bill of

rights and constitution, and the act of January 12th, 1802, took for the public the glebe lands held by the church. The constitution adopted in 1830 embodied the said act for the establishment of religious freedom in section 2 of article 3, and the constitution adopted August 1st, 1851, repeated this in section 15 of article 4, and, in section 32 of same article, provided 'that the General Assembly shall not grant a charter of incorporation to any church or religious denomination, but may secure the title to church property to an extent to be limited by law.' The present constitution has the same provisions upon this subject. See sections 14 and 17 of article 5.

"During the contest between the established church and the dissenters, which ended in the disestablishment, the Episcopal church, among its frequent memorials to the legislature, presented one on 4th June, 1784, which prayed 'that an act may pass to incorporate the Protestant Episcopal church in Virginia, to enable them to regulate all the spiritual concerns of the church after its form of worship, and constitute such canons, by-laws, and rules of government and good order thereof as are suited to their religious principles, and, in general, that the legislature will aid and patronize the christian religion.' House Journal, 36.

" This was responded to at the next session, and on the 17th of November, 1784 (House Journal, 27), it was ' *Resolved*, That acts ought to pass for the incorporation of all societies of the Christian religion which may apply for the same.' And, in addition, the body passed 'an act incorporating the Protestant Episcopal church' (Henning, 11, 532), which provides that the ministers and visitors of said church shall be a corporation, and shall manage all the affairs of the said church, both temporal and spiritual. This act was violently assailed, and was repealed at the October session, 1786, by an act in the following words:

"I. Be it enacted by the general assembly, That the act entitled ' An act for incorporating the Protestant Episcopal

Church' shall be, and the same is hereby, repealed, saving to all religious societies the property to them respectively belonging, who are hereby authorized to appoint, from time to time, according to the rules of their sect, trustees, who shall be capable of managing and applying such property to the religious uses of such societies. And to guard against all doubts and misconstructions,

"II. Be it further enacted and declared, That so much of all laws now in force as prevents any religious society from regulating its own discipline, shall be, and is hereby repealed. Henning, 12, 266.

"By the said act of 12th of January, 1802, confiscating the glebe lands, it was provided (see Code 1819, Vol. I., page 81), 'that nothing herein contained shall authorize a sale of the churches and the property therein contained, or the church-yards, nor in any manner affect any private donation made prior to the first day of January, one thousand seven hundred and seventy-seven, for church and other purposes, where there is any person in being, entitled to take the same under any private donor, nor to affect the property of any kind which may have been acquired by private donations or subscriptions by the said church since the date last mentioned.'

"On the 30th of January, 1806 (Session Acts, p. 42), it was enacted 'that all previous donations for charitable purposes, which were to have been controlled and managed by a vestry, should thereafter be managed and controlled by overseers of the poor of the county or town in which they were to be exercised, and they shall apply the same in such manner as may have been directed by the donors.'

"On the 3d of February, 1842 (Session Acts, p. 60), it was enacted that real estate conveyed for the use and benefit of any religious congregation as a place of public worship, should be held by trustees for such purpose, endowed with certain corporate powers, and the circuit and superior courts were authorized to appoint such trustees. At the revision of 1849

the act of 30th of January, 1806, and that of the 3d of February, 1842, the latter enlarged so as to embrace cemeteries, residences of ministers, and books and furniture to be used in public worship or by the ministers, were re-enacted (ch. 77, sections 3 to 17, Code of 1849), and the same provisions have been continued in the Code of 1860, ch. 77, and in the Code of 1873, ch. 76, with the limit of property enlarged.

"During the period subsequent to the revolution, the legislature has from time to time incorporated trustees to hold the property acquired and used for different purposes in church work—notably, for the education in seminaries of candidates for the ministry; and on the 8th of March, 1873 (Session Acts, p. 116), certain persons were incorporated, under the style of 'The Presbyterian Committee of Publication,' one of the committees of the Southern Presbyterian church, who were authorized to hold and manage all property, real and personal, acquired for the use of the said committee, not exceeding two hundred thousand dollars and one half acre of land in the city of Richmond, the vacancies in the body to be filled from the members of the said Committee of Publication. Indeed, the overseers of the poor authorized to hold certain church property were a corporation. Code 1860, § 9, ch. 51. The validity of the said act of the 8th of March, 1873, was called in question and sustained in the case of *Wilson* v. *Perry*, West Va. R., and also reported in S. E. Reporter, Vol. I., No. 8, 302."

From this historical review of the legislation touching the subject, it is perfectly clear that it never occurred to the legislature of Virginia that to incorporate church agencies, essential to the accomplishment of church work, was the same thing as the incorporation of the churches, respectively, in whose interests such corporate agencies have been created and still exist. Indeed, there is nothing in the provision of the constitution in question that could by possibility give the least support to the argument that the bequest in this case is repug-

nant thereto. That provision simply forbids the incorporation of any church or religious denomination, but at the same time it authorizes the legislature to secure the title to church property to an extent to be limited by law. The constitutional provision restricting the amount of church property to limits to be prescribed by law, was wisely designed to empower the legislature to guard against the too-great accumulation of such property—a precaution equally taken as regards all corporate bodies created by state laws and authorized to acquire and hold certain property for corporate purposes, and having an indefinite existence. The reason of the restriction to limits thus to be prescribed, is clearly and truly stated in the preamble to the said act of January 24th, 1799 (Code 1819, Vol. I., p. 78), entitled "An act to repeal certain acts, and to declare the construction of the bill of rights and constitution concerning religion, as follows : Whereas the constitution of the state of Virginia hath pronounced the government of the king of England to have been totally dissolved by the revolution, hath substituted in place of the civil government so dissolved, a new civil government, and hath in the bill of rights excepted from the powers given to the substituted government the power of reviving any species of ecclesiastical or church government in lieu of that so dissolved, by referring the subject of religion to conscience; and whereas the several acts presently recited, do admit the church established under the regal government to have continued so subsequently to the constitution, have bestowed property upon that church, have asserted a legislative right to establish any religious sect, and have incorporated religious sects, all of which is inconsistent with the principles of the Constitution and of religious freedom, and manifestly tends to the re-establishment of a national church," &c. Then follows the act which repeals, by its title, every statute deemed inconsistent with said preamble. Clearly, this legislative construction of the bill of rights is the foundation of all subsequent legislation in Virginia, whether constitutional or statu-

tory, concerning religion in this state. It, in unmistakable terms, declares that the bill of rights, by referring the subject of religion to conscience, has taken away from the civil government the power of reviving any species of ecclesiastical or church government, and that the incorporation of any church or sect is inconsistent with the Constitution and bill of rights, and tends to the re-establishment of religion by law, when the policy of the state is to abstain from any interference with the religion of its citizens. In other words, it proclaims, as one of the grand results of the revolution, that church and state are perpetually divorced, as set forth in the memorable words of the bill of rights, as follows:

"Religion, or the duty we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience."

It is plain to the commonest understanding, that in order to the dissemination of the christian truths, the education of men in christian principles, and the spread of christianity, the churches, of whatever faith or form of worship, must have, for the accomplishment of their great work, a secular as well as a spiritual vitality, money and property being essential to christian education and to the diffusion of christian knowledge, literature, and principles. In order to more effectually secure the great end in view, our government refers the subject of religion to the conscience of individuals, and leaves each sect to depend for its support upon free and purely voluntary contributions. Hence, while all effort to regulate religion by law, or to impose by law any particular faith or form of worship, or to compel any one to contribute to the support of any religious sect, is forbidden by the Constitution, yet churches or religious associations are recognized and treated, though unincorporated, as bodies entitled, under our form of government, to enjoy the benefits of property, which property, like that of

all other citizens, whether individuals, associations of individuals, or corporations, should be protected and secured to them by law. And it is in recognition of this sacred right that our Constitution authorizes, and in the very provision relied upon by counsel for the appellees, the legislature to secure the title to church property to an extent to be limited by law. And it was in furtherance of the same great principle of right that the Legislature of North Carolina incorporated the trustees of the general assembly of the Presbyterian church in the United States, the appellant corporation here. It is worse than idle to contend that the incorporation of said trustees was, in effect, the incorporation of the church. It might almost as well be contended that because the chief articles of export from the state of North Carolina are not the same as those of Virginia and many other states of the union, therefore she is not a qualified member of the union, and is excluded from the benefits of the law of comity prescribed by the Federal Constitution. And it would be equally plausible were it contended that a Virginia bequest to a citizen of North Carolina would be in violation of the said 17th section of Article V. of the Constitution of Virginia.

But, before drawing strained and unwarranted conclusions from the Constitution of Virginia to defeat this bequest to a North Carolina corporation, it would have been better to ascertain first that this bequest is repugnant to the Constitution and laws of the state of North Carolina. But this impossible task the learned counsel for the appellees did not undertake.

The argument that this bequest is in violation of the Virginia Constitution, if it proves anything, proves far too much for the object in view. In the light of repeated enactments of the Virginia legislature, incorporating agencies for the carrying on church work, it would prove either that the Virginia legislature has habitually violated the Constitution by incorporating similar church agencies, or that the unquestioned legislative policy has been to incorporate all churches by the

incorporation of such agencies. Take, for example, the act of February 28, 1854, incorporating the Protestant Episcopal Theological Seminary, prescribing as its property limit two hundred and fifty acres of land and two hundred and fifty thousand dollars' worth of property; the act of December 20, 1855, incorporating the Union Theological Seminary, belonging to the Presbyterian church, and fixing the same property limit; the act of January 8, 1875, incorporating the trustees of the Protestant Episcopal Education Society in Virginia, and limiting its property to two hundred and fifty thousand dollars. Each of these is but a corporate agency for the accomplishment of church work; and if the North Carolina act in question is, in effect, the incorporation of the church, the same is necessarily true as to each of them. But the fact is, neither the one nor the other amounts to the incorporation of a church. The corporators named in the North Carolina act are not described as members of any church, nor are they authorized to exercise any religious functions. The objects of the corporation consist in "taking and holding all such estate, property, and effects as may be acquired by gift, purchase, devise, or bequest, to aid the general assembly of the Presbyterian church to undertake and carry on the work of christian education; of foreign and domestic missions; for the publication of such books, tracts, and papers as are connected with the diffusion of religious literature and learning; for the relief of indigent ministers and the widows and children of deceased ministers, and all other benevolent objects of the church, and of building up and supporting churches of their faith and worship in the United States." "And said property is to be held, used, and disposed of according to the directions of the general assembly aforesaid." Thus the corporation is distinct from the church, and is made subject to the direction of its general assembly. The duties of the corporation, other than the mere details of government incident to all corporations, are confined to the management of certain property of the Presbyterian

church, and under its direction. No control of the spiritual or religious affairs of the church is given to the corporation. It is, therefore, but a legal device to secure " the title to church property," and might, without question, have been granted by the Virginia legislature, if domiciled in this State, under said sec. 17, Article V., of our Constitution. Indeed, as already shown, every object of this North Carolina corporation has been approved and uniformly fostered, as shown by numerous legislative enactments. Take, for example, the work of chris- tian education as conducted by our theological seminaries; that of foreign and domestic missions, carried on under the act of February 14, 1872, incorporating the board of foreign missions of the Baptist church; the publication of religious literature, carried on under the act of March 8, 1873, incorpo- rating the Presbyterian committee of publication; the relief of invalid ministers and their families, afforded by the act of January 16, 1886, incorporating the trustees of the Baptist ministers' relief fund of Virginia; the benevolent objects, under the act of March 1, 1856, incorporating the Young Men's Christian Association of Richmond, and numerous other acts incorporating benevolent societies; and the Acts of Assem- bly are full of them. So, too, as to the building up and sup- porting churches in the United States, which is but a branch of domestic missions, and a repetition at home of what is done abroad through the agency of foreign missions.

In the case here the testator does not attempt to vest in a foreign corporation real estate in Virginia, but makes a simple bequest of money to be paid to a foreign corporation. It is not pretended by counsel for the appellees that this corpora- tion is prohibited by the constitution of North Carolina from taking and using the money bequeathed in this case. Indeed, it seems impossible to discover any reason for defeating this bequest which would not equally apply had the bequest been to a citizen of North Carolina.

*Roy* v. *Rowzie*, 25 Gratt., 612, was the case of a Virginia

bequest to a theological seminary chartered by the legislature of South Carolina. This court held the bequest valid; and Judge Moncure, delivering the unanimous opinion of the court, remarked: "Even if it could be said that the passing of our law forbids the execution of such a trust in this state, there is certainly nothing in the policy of the law of South Carolina, where the trust created in this case was intended to be executed, which forbids it. And the will having been executed and admitted to probate according to the law of this state, the domicil of the testatrix, the fund would have to be paid over to the foreign corporation, to be administered according to the law of that state. The authorities cited by the counsel for the appellants fully sustain this proposition. Hill on Trustees, 468, 458, and the cases cited in the notes, and *Chamberlain* v. *Chamberlain*, 43 N. Y. R., 424, decided in 1871. If the law of Virginia prohibited a bequest to a theological seminary, whereve· situate, and whether incorporated or not, then certainly such a bequest would be invalid, no matter where the object might be located, whether in or out of the state."

We have, therefore, not only the legislative, but the judicial interpretation, standing solidly against the position assumed by counsel in respect to said 17th section of article V of the Virginia constitution and the alleged policy of our law. In this respect the above-quoted remarks of Judge Moncure are absolutely conclusive, and put an end to this branch of the case.

But, in order to break, if possible, the chain of legislative and judicial construction that binds them, counsel for the appellees undertake to treat this bequest as invalid, because it is "an indefinite charity for religious purposes"; and to sustain this remarkable contention, the doctrine announced in *Gallego* v. *Attorney-General*, 3 Leigh, 450, has been appealed to, and is insisted upon as still being the law of charities in this state, though this court decided directly the other way in the

case of the *Protestant Episcopal Education Society* v. *Churchman's Reps.*, 80 Va., 718. And, in order to break the force of the opinion in that case, counsel assume that, while the opinion assails the doctrine laid down in *Gallego* v. *Attorney-General*, "the decision does not touch it." This is a matter easily disposed of. The bequest in the Churchman case was "to the Trustees of the Protestant Episcopal Education Society of Virginia, to be used exclusively for educating poor young men for the Episcopal ministry, upon the basis of evangelical principles as now established." This bequest was held void by the circuit court of Augusta county, upon two grounds—first, because to a corporation, not absolutely for its own use as a corporate body, but in trust, to be exclusively used for the purposes therein named; and, second, because the uses and trusts declared by the testator "are null and void, being religious in their nature and too vague and indefinite to be upheld under the law of this state, or to be administered by a court of chancery, even if said trusts were merely educational." In the effort to maintain this most erroneous decree, counsel for the appellees confidently relied upon *Gallego* v. *Attorney-General* and like cases following it. The objection, then, that the bequest was invalid, because religious in character, was not only fairly made, but was sustained in the court below, and was insisted on in this court. This court, however, reversed the decree of the circuit court on both grounds. This objection is so aptly and completely answered by the Hon. W. W. Henry, of counsel for the appellants in this case, that we approve and adopt his language. He says: "Decisions are held to be precedents 'as to points actually in issue between the parties.' *Lewis* v. *Thornton*, 4 Munf., 94. And in the Churchman case the power of the court to enforce the bequest as a religious charity was one of the points in issue. Had the learned counsel noticed what Judge Tucker said on this subject in *Gallego* v. *Attorney-General*, 469, he would hardly have made this objection. In the case of *Baptist Association* v. *Hart*, 4

Wheat., 1, Judge Marshall said that the case might have gone off on the ground that the action was not brought by the Attorney-General, the plaintiffs on the record not having a right to sue. But he deemed it more satisfactory to discuss the case in all its bearings (pp. 50–51). It was objected in *Gallego* v. *Attorney-General* that the opinion of Judge Marshall was, therefore, extra-judicial. On this point Judge Tucker said: 'I do not consider it extra-judicial. The question discussed fairly arose, and was properly decided, after having been laboriously examined.' And so it must be held as to the doctrine of religious charities in this case."

The contention of counsel for the appellees that this case is not ruled by the Churchman case, and that *Gallego* v. *Attorney-General* is still the law of charities in Virginia, is but a repetition of the erroneous view taken by Judge Tucker in the last-named case as to the policy of our law in respect to charities for religious uses. It is broadly asserted that charities had their origin in the statute of 43 Eliz.; that it was in force in Virginia, and was repealed in 1792, and that since the repeal, courts of equity in Virginia have been without jurisdiction to enforce charitable bequests. Let us see what the supreme court of the United States says on the subject. In *Russell* v. *Allen*, 107 U. S., decided in 1882, Mr. Justice Gray, in delivering the opinion of the court, gives the substance of all the cases on charities previously decided by that court, and, in commenting on *Baptist Association* v. *Hart*, the source of all our trouble in Virginia on this subject, he says that the case "was decided upon an imperfect survey of the early English authorities, and upon the theory that the English law of charitable uses, which, it was admitted, would maintain the bequest, had its origin in the statute of Elizabeth, which had been repealed in Virginia. That theory has since, upon a more thorough examination of the precedents, been clearly shown to be erroneous, citing *Vidal* v. *Girard*, 2 How., 127; *Perin* v. *Corey*, 24 How., 465; *Ould* v. *Washington Hospital*, 95 U. S., 303.

In the last-named case Mr. Justice Swayne, speaking for the court, after referring to the doubts once entertained upon the subject, says that "upon reading the statute (43 Eliz., ch. iv.) carefully, one cannot but feel surprised that the doubts thus indicated ever existed. The statute is purely remedial and ancillary, * * * The learning developed in the three cases mentioned [*Vidal* v. *Girard, Fontan* v. *Revenal,* and another case] shows clearly that the law as to such cases, and the jurisdiction of the chancellor, and the extent to which it was exercised, before and after the enactment of the statute, were just the same." Other decisions and eminent text-writers holding the same views might be referred to, but these are all-sufficient to refute the argument that charities had their origin in the statute of 43 Eliz.

But it is insisted that the decision in *Vidal* v. *Girard,* and the long line of decisions of the same court following it, have no application to the Virginia doctrine in respect to charities, as laid down in *Gallego* v. *Attorney-General ;* that *Vidal* v. *Girard* is founded upon "old musty records exhumed for the occasion, and unknown even to the English judges." This is a suicidal argument, especially in view of the fact that, in almost the same breath that the English precedents are thus scoffed at, the same counsel appeals to this court to uphold the doctrine laid down in *Gallego* v. *Attorney-General,* upon the ground of its sanctity by reason of age and undisturbed repose; and the argument is pushed to the unreasonable extent of claiming that, inasmuch as long years elapsed, during which that decision was uniformly acquiesced in, the people in the mean time having adopted a new constitution, therefore that doctrine should be regarded as having been engrafted upon the fundamental law of the state. This is truly a novel position. It suggests a curious mode of embalming error. It will be a dark day for the old Commonwealth when it shall become the accepted doctrine that to remodel her organic law is to perpetuate all the previous errors of her courts.

As respects the scope and legitimate effect of the decision in the Churchman case but little need be said. The opinion in that case was prepared after the most thorough investigation, in which every available source of information was consulted, lest some landmark of the law, firmly embedded in principle, might receive the rude touch of judicial action without due consideration. It was in this spirit that the opinion of Judge Tucker in *Gallego* v. *Attorney-General* was reviewed, and the doctrine therein ar nounced overruled. In the Churchman case, as in this, objection was made to the validity of the bequest on the ground of its religious character. Guided by the highest authorities known to the law, it was shown that the decision in *Gallego* v. *Attorney-General* was but an adoption of the views of Chief-Justice Marshall in *Baptist Association* v. *Hart*, when it had been established beyond controversy that he was mistaken, and that the supreme court of the United States, in *Vidal* v. *Girard*, had refused the doctrine laid down in *Baptist Association* v. *Hart*, and has since uniformly adhered to the doctrine announced in *Vidal* v. *Girard*, except, according to the course of that court, in cases arising in Virginia, and supposed to be controlled by the doctrine laid down in *Gallego* v. *Attorney-General*: that the supposed policy of the law which was by Judge Tucker assumed to exist in Virginia, was not only not the law of this state, and never had been, but was directly opposed by every legislative enactment quoted and relied on by him to sustain it; that the doctrine of charitable trusts did not originate with the statute of 43 Eliz., but existed at common law, and that the statute was purely remedial and ancillary, and in no way changed the chancery jurisdiction over charities; that the statute of Elizabeth was local, not general, and was not repealed by the general repealing act of 1792, but that, even if it was a general, and not a local statute, and was in force in Virginia, and was repealed, even then the saving clause in the repealing act preserved to the people of

Virginia all the benefits of the statute so alleged to have been repealed.

It is obvious, therefore, that the statute of 43 Eliz., whether ever in force in Virginia or not, is entirely foreign to the question under consideration, as much so as if that statute had never existed even in England.

It is also contended by counsel for the appellees that the common-law jurisdiction of chancery over charities was prerogative, not ordinary; that there is no prerogative chancery jurisdiction in Virginia, and that, therefore, the doctrine of the Girard-will case has no application in this state. This argument concedes that chancery courts in England had jurisdiction over charities by virtue of the common law, but derived that jurisdiction from regal authority.

In England the king was, so to speak, the foster father of chancery, and, in its infancy and struggles for jurisdictional authority, helped it out of many a hard place. But it can make no difference whether in England the jurisdiction was prerogative or ordinary. The sole question is, did the jurisdiction evert on the 3d of July, 1776, when, by the ordinance of the Virginia convention, the common law, except when changed by statutes, was adopted?

And in the persistent effort to revive the doctrine laid down in *Gallego* v. *Attorney-General*, it is argued that there has been more judicial opposition to religious than to secular charities. This is doubtless true of some judges, and even of some church-members, but this only proves that now, as in days past, men, even professing christians, are to be found who are much more jealous of the church than of its great adversary. It does not prove that such opposition has amounted to a refusal to execute religious charities. And so far from there being in the policy of our law anything like hostility to religious charities, the uniform policy of our legislation has been to encourage and foster charities for educational and religious purposes. This has been especially the case as to legislation on the sub-

ject subsequent to the decision of _Gallego_ v. _Attorney-General._ The startling doctrine announced in that case seemed for a while to paralyze even the legislative arm of the government, but finally, shocked at the idea that church grounds and houses of worship, and even christian burial grounds, were not secure, the legislature rallied, and in 1839 and 1842 passed acts securing certain property to religious uses, and, from time to time, since 1842, with constantly-increasing liberality, similar acts have been passed, until now, it may be said, and with credit to the christian sentiment of our people, that the enforcement of charities like that here involved, is in full accord with the policy of our law. Moreover, the decisions of this court in late years, and prior to the Churchman case, show a decided tendency to repudiate the doctrine of _Gallego_ v. _Attorney-General;_ of which fact _Roy_ v. _Rowzie, supra, Missionary Society_ v. _Calvert's Adm'r,_ 22 Gratt., 357, and _Cozart_ v. _Mandeville's Ex'or,_ which was never reported, but is referred to by Judge Burks in his reported argument in the Churchman case. In all these cases bequests to religious corporations were upheld.

In _Missionary Society_ v. _Calvert's Adm'r_ the bequests were to "The Missionary Society of the Methodist Episcopal Church," a corporation created by the state of New York, and with these directions : "_It is my will_ that all my executors shall pay to the Missionary Society above stated _shall be paid to the Indian Mission by that Society of New York,_ and _the receipt of the treasurer_ shall be to that effect," &c. And the testator directed that the proceeds of the sale of the estate given to his wife for life "shall be paid over at her death to the said Missionary Society, at New York, _for the benefit and_ [to be] _applied to the Indian Mission._" These were held to be valid bequests.

It is useless to pursue the subject further. It is not true that the bequest in this case is forbidden by either the spirit or letter of section 17, Art. V., of the Virginia constitution ; nor is it true that it is repugnant to the policy of our law ; nor is it true that the doctrine asserted in _Gallego_ v. _Attorney-General_ is

now, or ever was, law in this state. That doctrine was intended to be, and was, repudiated and overturned in the Churchman case. It was but a precedent, and though it was more or less adhered to as such until repudiated, it never was law.

In the introductory note to Parson's late and valuable work on the Principles of Partnership, it is said: "A precedent, it must be borne in mind, is nothing but an experiment. If the proposition justifies itself, the principle stands; but if subsequent investigation shows that the proposition is unsound, it is set aside and replaced by the true principle." And in a note the learned author says: "In strictness, the decision of a judge is *not* law for succeeding cases; it is only evidence of the law. It is the testimony of a witness who is presumed to be learned and capable, explaining what the law actually is on the point in question. It decides the particular case, but it does not of necessity decide similar ones that follow. The succeeding judge *may* reject the testimony of his predecessor as erroneous; he may find that the law was not in fact what his predecessor declared it to be; he may, therefore, *overrule* the prior decision," citing Hadley's Roman Law, p. 68–9.

These remarks are founded upon a philosophical principle essential to the very life of the law; and it was by the application of this principle that the supreme court of the United States, in *Vidal* v. *Girard*, retraced its steps and reversed the erroneous principle it had promulgated in *Baptist Association* v. *Hart*. And this court, in *Gallego* v. *Attorney-General*, having not only adopted but aggravated that error, should in like manner have corrected itself.

It only remains to say that, inasmuch as the 4th section of the charter of the legatee corporation, the trustees of the general assembly of the Presbyterian church in the United States, provides "that if the general assembly shall establish any committees, boards, or agencies, for any of the purposes recited in section 1st, the same shall be held and deemed to be branches of this corporation," &c.; and it appearing that the " executive

committee of foreign missions" was created by said general assembly, and exists as a branch of said incorporation, and that by the words, "*board* of foreign missions," &c., the testator meant the "executive committee," &c., it is clear that it is a valid bequest to said corporation, as a gift to a branch of a corporation is, *ex necessitate rei*, a gift to the corporation. And the commissioner of the court below having properly found these facts, and also that the bequest is sufficiently definite in all respects, and capable of being executed, and that the same should be decreed to said corporation for the use of said "executive committee," of which Rev. M. H. Houston is a member and also the secretary and executive officer; and the the report of said commissioner having been excepted to because of said finding, and the court having sustained the exception and decreed the bequest to be null and void, and the fund bequeathed to be distributable among the heirs-at-law of the testator, it is equally clear that in so decreeing the said circuit court was plainly in error. We are, therefore, clearly of opinion to reverse the said decree and enter a decree here declaring said bequest valid and payable to said corporation for the use aforesaid, and to remand the cause to said circuit court to be further proceeded in according to the views expressed in this opinion.

Lewis, P., concurred in the results of the opinion delivered by Judge Richardson, because he regarded the doctrine laid down in *Gallego* v. *Attorney-General*, 3 Leigh, 450, as overruled by the Churchman case, and he thought the law upon the subject ought to be settled.

Decree reversed.