In the Matter of the Probate of the Last Will and Testament of FRANCES PAGET PRICE, Deceased.

ELMIRA COLLEGE, Appellant; WALLACE R. FOSTER, as Executor, etc., of FRANCES PAGET PRICE, Deceased, Respondent.

Third Department, April 29, 1942.

*Nathan Turk* [*Clayton R. Lusk* of counsel], for the appellant.

*Truman & Parmerton* [*James S. Truman* of counsel], for the respondent.

HEFFERNAN, J. Frances Paget Price, a widow, residing in the county of Tioga, died on April 26, 1940, without descendants, leaving as her distributees two brothers, a sister and descendants

of a deceased brother. She left a last will and testament executed on August 21, 1936, and two codicils thereto, one executed on June 9, 1939, the other on February 22, 1940, which were admitted to probate in the Tioga County Surrogate's Court on October 7, 1940.

After making some minor bequests the will of testatrix gave her farm, her household furniture and practically all her personal property to the Board of Pensions of the Presbyterian Church in the United States of America, the farm to be used as a home, to be called "The Paget Price Presbyterian Home," for retired Presbyterian ministers and their wives, and the income from the personal property to "be used toward the upkeep and maintaining" of the home.

In the first codicil testatrix revoked the gifts to the Board of Pensions of the Presbyterian Church and directed her executor "to cause to be organized and incorporated under the proper law of the State of New York, a charitable corporation having its business office at Owego, New York, to be known as 'The Paget Price Presbyterian Home.' The purpose of the corporation shall be to conduct a home for retired Presbyterian ministers and their wives." She bequeathed her farm and household furniture to the corporation in trust for the benefit of the home. She gave the balance of her estate, consisting of personal property, to the corporation " in trust, however, to invest the same and keep it invested and to apply the net income arising therefrom to the maintenance, upkeep and operation of said Home." She then provided that " in case my intention with respect to the said Home shall because of illegality fail or become impossible of realization, I then give, devise and bequeath the property intended for the establishment and use of said Home, to Elmira College and Cornell University, to share and share alike."

The second codicil is but slightly different from the first. In that instrument testatrix made some specific legacies of personal property and made Elmira College, of which she was a graduate, the contingent legatee. In each codicil testatrix made alternative provision for the disposition of her entire estate with the exception of certain small legacies.

The real estate which testatrix owned and which she devised to the corporation consists of about thirty-two acres of land situated about three miles from the village of Owego. A well-constructed highway leads to the property. The structures on the farm comprise a main building or residence, a cottage, a garage, a barn and a pumphouse. The residence is a two-story frame building with nine rooms on each floor and several well-equipped bath rooms

and is supplied with water by means of an automatic water system. It is not disputed that the cost of reproduction of the main building would be $20,000 and of the cottage $3,000. The main building and the cottage are well constructed, comfortably furnished and equipped with all conveniences for a comfortable home.

It was stipulated that the net amount of personal estate, at the date of testatrix's death, available for investment was $57,809.84, which would produce an annual income of from $2,500 to $2,800. This does not include securities, valued at $5,700, which at the time of the trial were non-productive. If these securities should later yield a return the annual income will be increased.

On the date when decedent's will and codicils were admitted to probate, Elmira College petitioned the Surrogate's Court for a construction of these instruments and asked that the trust be avoided as impossible of realization because of inadequacy of the fund and further that it be decreed that it is entitled to such fund as secondary legatee. The surrogate, after a trial lasting several days, sustained the trust and from that determination appellant has come to our court.

Pending the determination of this proceeding the parties have agreed that the corporation which testatrix directed to be formed would not be organized.

Appellant in its brief has told us that testatrix was cultured, intelligent and highly educated, a woman of refined tastes, a college graduate who had continued her studies abroad, and who was engaged as a teacher in the New York city schools at the time of her death. The desire to ameliorate the condition of retired Presbyterian clergymen and to provide an asylum for some of them and their wives in their declining years unquestionably was a project dear to her heart. Manifestly it was the dominant thought in the will and in each of the codicils. It is quite significant that the last codicil was executed just two months and four days prior to her death. Undoubtedly she then believed that her estate was ample to establish the home which she desired to be founded. There is no evidence to indicate any change in her intentions or in the value of her estate during that period. In view of her education, intelligence and training we cannot reasonably conclude that she intended to add a codicil to her will which would be ineffective. The reason for the gift over to Elmira College is not difficult to understand. She was a graduate of that institution, and if her primary purpose became impossible of realization by reason of illness, depreciation in the value of her property or other altered circumstances, she did not want the bulk of her estate to pass according to the laws of intestacy. She had the absolute

right to dispose of her property as she saw fit. She elected to devote it to a charitable purpose which appealed to her. It was her prerogative to fix and define its nature. She was acting within her undoubted right in selecting the beneficiaries of her estate. It is our solemn duty to effectuate her testamentary intention if we can do so without doing violence to legal principles.

Charitable gifts and trusts are of ancient origin, are favorites of courts of equity and such gifts and trusts will be upheld and declared valid whenever possible consistently with established principles of law. Courts of equity go to the length of their judicial power in sustaining them. Thus, in order to sustain and give effect to a charitable trust or gift, every reasonable intendment, consistent with the terms and purpose of the gift, will be made, and every presumption, consistent with the language used, will be indulged. Of two possible constructions, the court will adopt that one which operates to sustain the trust or gift. (*Matter of Durbrow*, 245 N. Y. 469; 14 C. J. S., Charities, § 6.) The doctrine that charitable gifts will be given effect, if consistent with law, and that to such ends the most liberal rules within the allowable limits of chancery jurisdiction will be resorted to, if necessary for their support, is so generally upheld and applied as to remove the question from the field of debate.

The *cy pres* doctrine cannot properly be applied here. That doctrine has no application because testatrix herself has provided for a gift over of the property in the event of the failure of the charitable use to which she, in the first instance, directed that it should be devoted. (*Matter of Fletcher*, 280 N. Y. 86; 14 C. J. S., Charities, § 52; 10 Am. Jur., Charities, § 124; Restatement, Law of Trusts, §§ 399, 413.)

In support of its contention that the fund is inadequate to establish and maintain the type of home directed by testatrix appellant swore a number of witnesses, much of whose testimony is irrelevant. Appellant takes the position that the home should be equipped to operate at full capacity. No such inference can be drawn from the language of testatrix. She merely directed that a home be established for retired Presbyterian ministers and their wives. She made no specification as to the number to be accommodated. On the trial two Presbyterian ministers, eligible for retirement, and their wives, testified that they had examined the Price property and would be interested in becoming guests of the home which testatrix directed to be founded.

The inadequacy of the trust fund cannot in any way affect the validity of the trust; the trust will be carried into effect so far as possible. (*Matter of MacDowell*, 217 N. Y. 454; *Taylor* v. *Columbian*

*University,* 226 U. S. 126.) The plan of testatrix should be carried out to the extent of the funds provided. (*Wilson* v. *First National Bank of Independence,* 164 Iowa, 402; 145 N. W. 948.)

It would serve no useful purpose to analyze the voluminous evidence in this record. As heretofore indicated, a great deal of it is not material to the only issue in the case. Some brief comment, however, is necessary.

Among other witnesses called by appellant was one Hoddick, an employee in the Department of Social Welfare. At the request of appellant he gave the real property a very cursory examination. He testified in great detail as to what he would require in the way of extensive improvements to the property before the Board of Social Welfare would indorse the incorporation and operation of the proposed home. As a matter of fact, he has no authority either to give or withhold his approval to the project. He is a mere subordinate to carry out the will of another.

Appellant asserts that the Board of Social Welfare would not consent to the formation of the proposed corporation. There is no proof in the record to sustain that statement. If we assume that the consent of the Board is necessary under section 35 of the Social Welfare Law that consent may not be arbitrarily or capriciously refused. Furthermore the action of the Board in declining to approve such a certificate of incorporation would be reviewable by the Supreme Court.

The Social Welfare Law, which is a consolidation of the State Charities Law and the Public Welfare Law, was enacted by chapter 619 of the Laws of 1940 and became effective March 1, 1941. Under that law the authority of the Board of Social Welfare over homes not in receipt of public funds is very limited.

The State Constitution (Art. XVII, § 2), after providing that the State Board of Social Welfare shall be continued and shall visit and inspect all public and private institutions of a charitable, eleemosynary, correctional or reformatory character in receipt of public funds, provides as follows: " As to institutions, whether incorporated or not incorporated, having inmates, *but not in receipt of public funds,* which are of charitable, eleemosynary, correctional or reformatory character, * * * the said Board of Social Welfare shall make inspections, or cause inspections to be made by members of its staff, but *solely* as to matters directly affecting the health, safety, treatment and training of their inmates, * * *." (Italics supplied.) The section then provides that the Board may make rules and regulations for the performance of its duties. Appellant stresses a number of these rules, apparently overlooking the fact that no rule inconsistent with this section of the Constitution may be adopted.

The Social Welfare Law (§ 21, subd. 2) has a like provision to that embodied in the Constitution.

It is evident, therefore, that the Board of Social Welfare has no jurisdiction over the financial affairs of the home which testatrix directed should be established. The question of finances is the only one involved here. The Board has no power to make or enforce orders as to homes not in receipt of public funds. It may make recommendations to such an institution, and if such recommendations are not complied with it may then apply to the Supreme Court, on notice, for a determination of the question involved. It, therefore, clearly appears that the Board has not the slightest authority to compel the proposed corporation to adopt the numerous requirements referred to in Hoddick's testimony and emphasized in appellant's brief.

The testimony of Mrs. Banker, another witness for appellant, deserves attention. She is in charge of a home for retired Presbyterian ministers and their wives located at Ballston Spa, N. Y. Mrs. Banker testified as to the equipment of the home and the number of employees required. She said, among other things, that if the home were operated for the benefit of two ministers and their wives the staff should consist of a matron, a nurse, a cook, a caretaker and a maid. Mrs. Banker would provide liveried servants and chauffeurs; in fact each resident at the home would have a personal servant, in addition to other service. Reading her testimony brings the conviction that Mrs. Banker was not planning a home for retired ministers and their wives but rather a palatial establishment equipped and staffed to entertain sybarites.

This court is presumed to know what every one else knows. It is common knowledge that the various religious sects are either unable or unwilling to provide the clergymen of their faith with magnificent homes and luxurious appointments. As a rule, the clergy must be content with the bare necessities. Mrs. Price was an intelligent woman and certainly never intended that those who partook of her bounty should be maintained on the opulent scale which appellant would have us believe.

In opposition to appellant's proof, the respondent offered the testimony of credible, practical and disinterested witnesses to the effect that with efficient and economical management the income from the trust fund is fully adequate to operate and maintain the home and provide for the accommodation of a reasonable number of clergymen and their wives. From the evidence the surrogate concluded, and we think justly so, that the intention of testatrix is not impossible of realization. It is not for us to inquire into the wisdom of the gift nor should we be zealous in our quest to

find some pretext to defeat the intention of the giver. The purpose of testatrix is a worthy one and there is nothing in reason or authority which requires us to condemn it as impossible of realization. Until her plan has been tried and found wanting this court would not be justified in bestowing her property upon appellant.

It may be that the fund provided is insufficient to afford accommodation for all persons eligible thereto under the terms of the trust, but that is no reason why the corporation should not be permitted to organize and carry on a home for the benefit of as many as may be accommodated within the means at its disposal. No charity is unlimited in its resources, and all must draw a line upon admission to their benefits, when their ability to extend such benefits is exhausted.

A court of equity is not warranted in substituting a different plan for that which testatrix primarily prescribed in the instrument creating this charitable trust, merely because a coldly wise intelligence, impervious to the special predilections which inspired her liberality and indifferent to her final word as to the disposition of her property, would have dictated a different use of her money.

The decree of the Surrogate's Court should be affirmed, with costs and disbursements against appellant.

CRAPSER, BLISS and FOSTER, JJ., concur; HILL, P. J., dissents, in an opinion.

HILL, P. J. (dissenting). Appeal by Elmira College, alternative residuary legatee, from a decree construing the will of testatrix. She left a will and two codicils whereby she directed the organization of a charitable corporation. The final direction as to the incorporation and its purpose is in the fourth paragraph of the first codicil. It is quoted in so far as it is relevant to this discussion.

" IV. As soon as convenient and possible after my decease, I direct the Executor of my said will, at the expense of my estate, to cause to be organized and incorporated under the proper Law of the State of New York, a charitable corporation having its business office at Owego, New York, to be known as ' The Paget Price Presbyterian Home.' The purpose of the corporation shall be to conduct a home for retired Presbyterian ministers and their wives. The number of its Trustees shall be at least six, a majority of whom shall be residents of the Town or Village of Owego, New York."

She bequeathed the residuary portion of her personal estate to this corporation in trust, " to invest the same and keep it invested and to apply the net income arising therefrom to the maintenance, upkeep and operation of said Home," with the alternative pro-

vision contained in the second codicil: " In case my intention with respect to the said Home shall, because of illegality, fail or become impossible of realization, then I give, devise and bequeath the property intended for the establishment and use of said Home to Elmira College, of which I am a graduate."

Subject to the same alternative direction she devised in trust to the corporation when incorporated, for the benefit of the home, a farm of about thirty-two acres upon which there is a main residence, cottage, garage and outbuildings, also household furniture and effects. This real property is about three miles from Owego, N. Y. The residuary of her personal estate amounts to between $50,000 and $60,000, which, the evidence shows would return an income of between $2,000 and $2,500 annually.

A corporation of this kind may not be organized without the written approval of the Board of Social Welfare of the State (Social Welfare Law, § 35), and the home would be subject to visitation by the Board, and its recommendations, if not accepted, are enforcible by the Commissioner of Social Welfare by application, if necessary, to the Supreme Court. The appellant called as a witness the Director of the Bureau of Welfare Institutions and Agencies of the Social Welfare Department of the State. He testified, in substance, that it would be impossible to conduct the home upon the income which would be available. He had inspected the real estate and considered the matter in his official capacity, and attended the hearing with the approval of the Commissioner of Social Welfare, the State paying his expenses. He stated in answer to an inquiry as to why the State would send an official to investigate and testify: " The State does not want homes to be established which will give the Department difficulty. The State has had experience with such homes, and sends their men voluntarily without their being subpœnaed." In answer to a similar question he said: " We are interested in not having homes established that will give us trouble later on." Another witness was the matron of a home in Ballston Spa, N. Y., for retired Presbyterian ministers and their wives. There were eleven guests in the Ballston home, with a capacity for six more. The inference to be drawn from her testimony agreed with that of the State official. Having in mind that inside and outside help would be necessary, and that the location would require a conveyance, the conclusion arrived at by these witnesses does not seem doubtful in view of the expense which is involved in conducting a similar private home.

The theory of the respondent that the guests would do their own work is not practicable, and would not be permitted by the supervising State authorities. The proposed guests would have

served their congregations as long as physical and mental strength would permit. Such persons, of the age at which admissions are usual, would not be able to conduct this place in a manner creditable to the donor or the State. The will first provided for the establishment of the home under the supervision of the Board of Pensions of the Presbyterian Church. The change and other evidence permits the inference that this body of experienced churchmen, devoted to the best interests of the aged who had ministered to their congregations, regarded the matter as impracticable.

The trust created in *Matter of MacDowell* (217 N. Y. 454) and the issue presented there differ in all respects from the instant case. The $63,000 available was insufficient to carry out the trust in the manner contemplated by the testatrix, but that will contained no alternative bequest, and the court determined that the *cy pres* doctrine should be invoked. " Inadequacy of the trust fund to accomplish the purpose of the testator in the manner originally intended may, however, justify the scheme of the charity being changed. If the Supreme Court cannot cause this trust to be carried out in the precise manner contemplated by the testatrix it will apply the trust fund to other charities as nearly as possible like that specifically mentioned in the will " (p. 466). *Matter of Fletcher* (280 N. Y. 86) dealt with a trust and an inadequate income. The testator in his will provided for the establishment and maintenance of a hospital which would cost more than $300,000 to build, with the annual cost of operation more than $100,000. There was available a fund of about $150,000, two-fifths of which was to be expended for the building, and three-fifths devoted to a trust fund for maintenance. The will contained an alternative bequest: " *Fourteenth.* Should any of the bequests made in this my Will, for any reason, be declared illegal or inoperative, I make a bequest or bequests of the same amount or values to Charles S. Chadwick, to be his and at his disposal." The opinion states: " Even if we were to assume that, in the absence of paragraph ' fourteenth ' the provisions of subdivision 2 of section 12 of the Personal Property Law (Cons. Laws, ch. 41) and the recent decision of this court in *Matter of Neher* (279 N. Y. 370) would authorize the application of the *cy pres* doctrine, such an assumption would necessarily be rebutted by the explicit provisions of paragraph ' fourteenth.' The testator, by paragraph ' fourteenth ' made clear beyond any conceivable doubt that, if the bequest under paragraph ' fifth ' should for any reason be declared inoperative, the amount therein mentioned should go to appellant Chadwick " (p. 91).

The argument advanced by respondent that the fund could be invested at a higher rate of return, say five or six per cent, is not sustained by present-day investing experience. A high rate of return is a concomitant of insecure principal.

The decree of the surrogate should be reversed on the law and facts, and this court should make a finding that the project to establish the home is impossible of realization, and that Elmira College takes as a legatee under paragraph " VII " of the second codicil of the will.

Decree of the Surrogate's Court affirmed, with costs and disbursements against appellant.