Virginia Marrow SMITH, Eugene B. Chase, Jr., and Ferris Byard Derickson, Appellants,

v.

Roderick D. MOORE, sole surviving administrator, D.B.N., C.T.A., and trustee of the wills of George B. West, deceased, and Missouri P. Smith, deceased, Virginia Tabb Moore, University of Richmond, a Virginia Corporation, Appellees.

No. 9620.

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1964.

Decided March 22, 1965.

F. Lee Ford, Newport News, Va., and Neill H. Alford, Jr., Charlottesville, Va. (William H. Townsend, Columbia, S. C., Lipshutz, Macey, Zusmann & Sikes, Atlanta, Ga., Townsend & Townsend, Columbia, S. C., and Ford & Avis, Newport News, Va., on brief), for appellants.

Richmond Moore, Jr., Richmond, Va. (S. W. Colonna, Colonna, Lieberman & Cutler, Newport News, Va., and Tucker, Mays, Moore & Reed, Richmond, Va., on brief), for appellees.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and WINTER, District Judge.

WINTER, District Judge.

In this case, we must decide whether a trust created by the last will and testament of George B. West, as augmented by a trust created by the last will and testament of his sister, Missouri P. Smith, has failed and, if so, what is the proper disposition of the corpus thereof. The appeal is before us at the instance of the testator's surviving heirs at law, two great grandnephews and a grandniece, from a determination that no rights to possession of the corpus of the trusts had arisen in favor of them, 225 F.Supp. 434 (1963).

George B. West executed a holographic last will and testament on May 28, 1910 and a codicil dated January 27, 1912. He remained a bachelor throughout his life and died March 3, 1917. By his last will he directed the payment of his debts,

made a bequest of his household goods and effects to his niece, Emily M. Barrett, the daughter of Missouri P. Smith, established annuities for another niece and nephew, and created a life estate in the residue in favor of Emily M. Barrett. The codicil cancelled certain debts owing to him by his nephew and the nephew's wife, and made three bequests to religious organizations affiliated with the Baptist Church.

The will provided that upon the death of the life tenant, Emily M. Barrett, the executors should

"'* * * pay over all of my personal estate and convey all real estate belonging to my estate to the Board of Directors of a Hospital hereinafter named and described and directed to be organized and incorporated, or to such persons as they may direct, to be held for the use and benefit of said Hospital as hereinafter provided.'"

After granting authority to sell real estate without requiring the purchasers to see to the application of the purchase money, the testator wrote the sixth and seventh clauses of his will, giving detailed instructions for the establishment of the aforesaid hospital in the following manner:

"'Sixth.—My executors hereinafter named or the acting or surviving one of them, or my personal representative shall after the death of my niece Emily M. Barrett select and associate with them or him as many other men as will make nine men including such executors, executor or personal representative or representatives, who to-gether (sic) shall incorporate organize and establish a free Hospital in the City of Newport News, Va., or within five miles of its then corporate limits to be after the pattern of the Sheltering Arms Hospital of Richmond, Va., and of which the said nine men shall be the officers and directors for the first year with power in them and their successors to fill vacancies as they may occur. The Hospital shall be named "The Parker and Mary West Hospital," after my parents. It shall be non-sectarian and entirely free from charges and pay by or from its patients and said hospital to minister to all worthy white persons from the City of Newport News, Va. and Eastern Virginia, who are not able to pay physicians and hospital charges, and are not incurable and have no contagious diseases. Preference being given to patients of Newport News, Va.

"'Seventh.—My said executors, executor or personal representative or representatives shall at the death of my said niece Emily M. Barrett or as soon thereafter as they may deem practicable, turn over, transfer and assign to such officers of said hospital, all of my personal and real estate then in their hands or under their control (except that part of my estate specifically bequeathed) to be used for the establishment and maintenance of said free hospital. I desire and direct that not more than one-fifth (⅕) of my estate shall be used in the purchase of a site for said hospital and in erecting buildings and furnishings and equiping (sic) the same. I desire and direct that the income derived from the balance of my estate shall be used and applied to the maintenance of said hospital. The principal thereof to be left intact as an Endowment Fund of said Hospital. The receipts and income therefrom to be used for maintenance and current expenses of said hospital. The Board of Directors and Board of Managers shall serve without pay.'"

The will made no gift over for the disposition of the trust in the event its specific purpose failed.

Emily M. Barrett survived her uncle, as did her mother, Missouri P. Smith. The latter, by will executed in 1920 bequeathed her household goods and effects to Emily M. Barrett for life, with the "remainder at her death to the Hospital hereinafter named and provided for."

After housekeeping directions for the payment of taxes and expenses of administration and making monthly bequests to two nieces during the period that they should be in college, Missouri P. Smith created a life estate in the rest and residue of her estate for her daughter, with the precatory provision " * * * I would suggest and request that, as to any unexpended income from my estate she will give same at her death to the Hospital sought to be established by my brother and myself as a family memorial." [1] The will of Missouri P. Smith then continued:

"At the death of my said daughter said executors and trustees shall turn over the entire remainder of my estate, of every sort and description to the 'Parker & Mary West Hospital,' to be incorporated as provided in clause six (6) of the will of my brother, Geo. B. West, which is on record in the Clerk's Office at Newport News."

Emily M. Barrett died in 1953 and her will and codicil were admitted to probate on September 4, 1953.

The district court found that the two great grandnephews and a grandniece were heirs at law of the testator and testatrix and would be entitled to share in the distribution of the balance remaining in their estates and trusts if there has been a failure of purpose. Because the district court found no failure of purpose which the application of legislative *cy pres* could not correct, it did not adjudicate the respective shares to which the great grandnephews and grandniece, and other persons having possible claims, would be entitled.

The district court also found that the combined estates have a value approxi-

mating $700,000.00, and that one-fifth of even the *combined* estates would be grossly insufficient for site acquisition, constructing a hospital and equipping the same under prices prevailing at any time since the death of Emily M. Barrett. Specifically, the lower court found that the minimum basic cost of constructing a forty-bed hospital would be approximately $560,000.00, without equipment or site acquisition costs, and a more realistic cost of a forty-bed hospital, patterned after Sheltering Arms Hospital, would be in excess of $900,000.00, exclusive of land acquisition costs. These findings are fully supported by the record and adopted by us.

We accept, also, the findings of the district court with reference to the history of Sheltering Arms Hospital, still in operation in Richmond, Virginia significant in that the history of the hospital must have been known to George B. West at the time he executed his will and republished it in connection with the execution of the codicil. The court found:

"This institution demonstrates a pattern of sacrifice and hard work, modesty and faith, all with little or nothing at the beginning, but eventually giving rise to a growth of considerable importance to the City of Richmond and its needy sick. It was established in 1889. With six patients and one nurse, it was initially housed in part of a hotel in downtown Richmond. With the assistance of gifts and solicited funds, the hospital progressed. In 1892 a residence was purchased and remodeled, opening in 1894 with 17 beds. In 1901 a group of leading citizens established an endowment fund

---

1. Whether Emily M. Barrett spent the portion of her beneficence not needed for her own use or gave it to the hospital is not disclosed by this record, but, by will dated September 2, 1944, Emily M. Barrett made a bequest of $25,000.00 to the administrators of the estate of her late uncle, to become part of his estate and to be administered as a charity, in accordance with the provisions of his will. She referred to the "Parker and

Mary West Hospital" as a project " * * * very dear to the heart of my uncle * * * as is evidenced by his will, and he expressed to me the desire that I should assist in accomplishing this benevolent purpose." However, by codicil dated August 10, 1951, she revoked this bequest, stating that "Conditions having changed since the execution of my will * * * I hereby revoke," etc.

through contributions sufficient to provide $16,000.00 annual income. An annex was constructed in 1909–1910, thus increasing to 41 the bed capacity. This was the situation existing when George B. West prepared and executed his will. Services of physicians were entirely voluntary at Sheltering Arms. There was a nursing school on the premises and, in 1909–1910, there were two graduates. The physical plant of the hospital was extremely modest. Surgical, medical, obstetrical, orthopedic and pediatric services were available but it had no X-ray facilities. The staff made its own supplies, bandages, etc., but numerically the staff was always small and, as late as 1922, there were only 10 nurses in training, 2 graduate nurses, an interne, and approximately 12 additional persons supplying general services such as cooking, janitorial, orderly, etc."

Before the lower court, appellee, the successor administrator d. b. n. and c. t. a. and trustee of the estates of George B. West and Missouri P. Smith, advanced two solutions to the problem of application of the combined corpus of the two estates. One proposal, that the north wing of the existing Riverside Hospital in Newport News be purchased for $150,000.00, including the equipment, and used for hospital purposes, need not be further considered because, after submission of the case to the lower court and prior to decision, this wing was sold to other interests. The other proposal was that a clinic be constructed as a part of the new Riverside Hospital, then in the process of construction, to be an integral part of the new hospital, but named "The Parker and Mary West Clinic." Although the district court did not make specific findings in this regard, testimony was presented that the clinic, described as a wing of the new hospital, and consisting of out-patient, physical medicine and emergency departments, would cost $214,281.30, with a total cost of the wing, excluding land, in the amount of $424,-

998.00. It would have a separate entrance to the outside, over which would be inscribed the name "The Parker and Mary West Clinic." Appellee proposed to invest 20% of the funds in his hands (approximately $140,000.00) in the new clinic wing and to use the balance as a trust fund to pay hospital bills of indigent white patients. Riverside's board of directors, presently consisting of seven in number, would be enlarged to nine, one vacancy to be filled by appellee and the other by a person named by appellee. The board would be incorporated in accordance with the directions in the testator's will and it would administer the residue of the trusts as an endowment for the purposes specified by the testator. While record title to "The Parker and Mary West Clinic" would presumably be vested in the directors of the Riverside Hospital, these same persons would be the directors of the hospital corporation which George B. West directed to be incorporated.

Evidence was offered to show that the Riverside Hospital treats charity patients just as any others, that the staff furnishes free medical treatment for them, that welfare patients are charged $19.50 per day payable from public funds, that West-Smith charity patients would be charged the same payable from the income of the West-Smith trusts, and that a net income of $27,500.00 (the approximate figure at 5% of 80% of $700,000.-00) would take care of 200–225 charity patients per year on the basis of an average six-day stay. The testimony that Riverside would furnish free medical treatment for charity patients was corroborated by the chief of staff of Riverside Hospital, who said that his staff would furnish free medical service to West-Smith charity patients whether they were in Riverside or a separate institution.

The district court declined to give its approval to furtherance of "The Parker and Mary West Clinic" plan, even though the court conceded that this plan had certain commendable features, because the court found that the " * * * plan does not come within the framework of

the expressed intentions and directions of the trust, and cannot be carried into effect unless legislative or judicial *cy pres* is invoked." The court rejected application of the doctrine of equitable approximation, such as was employed in Thomas v. Bryant, 185 Va. 845, 40 S.E.2d 487, 169 A.L.R. 257 (1946), but the court did find legislative *cy pres* to be available by holding that George B. West and Missouri P. Smith expressed a general charitable intent in their last wills, and that § 55–31 of the Code of Virginia (1950) [2] could be applied retroactively so that effect could be given to the general charitable intent of the testator and testatrix without deciding whether the doctrine of judicial *cy pres* was recognized in Virginia. Having found the case an appropriate one for the exercise of legislative *cy pres*, the district court held that an appropriate Virginia state court should, on petition by the appellee, allocate the corpus of the trusts.

We agree with the district court that the trusts have not failed, but we disagree as to the grounds upon which the decision should rest and the ultimate disposition to be made of the case.[3]

The common law of Virginia relating to *cy pres*, perhaps by reason of Virginia's having been one of the original states and thus having its law enunciated under the influence of Chief Justice Marshall, is in the mainstream of the confusion, contradiction and equivocation attaching to the history of the doctrine of *cy pres* in America. That history has been exhaustively discussed in cases, treatises and periodicals, and it will not be recapitulated in detail in this opinion. It is sufficient to say that the Virginia courts followed the opinion of Chief Justice Marshall in the celebrated Philadel-

2. "§ 55–31. Indefiniteness not to defeat certain trusts.—

"When any corporation, firm, association, partnership or person gives, bequeaths, grants, conveys or devises any real or personal property in trust to or for any educational, charitable or eleemosynary purpose, the indefiniteness or uncertainty of the beneficiaries named in any instrument creating such a gift, bequest, grant, conveyance or devise, or the indefiniteness of the purpose of the trust itself, shall not defeat any such trust and, if the trust is in other respects valid under the laws of this State, it shall be administered to conform as near as may be to the purpose for which created or, if impossible of performance for *this purpose, for some other educational*, charitable, benevolent or eleemosynary purpose. However, unless the maker of the trust has specifically designated some other body, committee, agency or entity to determine what that purpose shall be and to administer the trust (in which event the determination and administration by that body shall be valid), the determination of the purpose of the trust shall be made by a court of equity in the county or city wherein the property or the greater part thereof is located and the administration of the trust shall be under the direction of such court. The provisions of this section shall not apply to or affect any trust or fund which is the subject of pending litigation."

This section was enacted by Chapter 81 of the Acts of the General Assembly of Virginia of 1946.

3. Being concerned about the jurisdiction of the district court to hear the instant case [Foster v. Carlin, 200 F.2d 943 (4 Cir. 1952); King v. Richardson, 136 F.2d 849 (4 Cir. 1943); 1 Barron and Holtzoff, Federal Practice and Procedure (Wright's Ed.) § 51.1], or if the district court had discretionary jurisdiction, the appropriateness of its exercising jurisdiction [Great Lakes Dredge and Nav. Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Aetna Casualty & Surety Co. v. Quarles, 92 F.2d 321 (4 Cir. 1937)], post argument, we solicited the views of counsel on these points. All counsel are agreed and we are now satisfied that diversity jurisdiction existed, 28 U.S.C.A. § 1332, calling for exercise of the equity process of the district court, that all parties having an interest in the subject matter were before the district court, that a decree would be binding on all parties and res judicata of the issues decided, and that in view of the disposition we make of the case, further proceeding in courts of the State of Virginia are not necessary except with regard to the allowance of costs of this litigation against estates in the course of administration. As to the latter, we express no view.

phia Baptist Association case [4] to the effect that the power of *cy pres* was not a part of the inherent power of equity, but could exist solely by virtue of statute. Virginia adhered to this view despite the subsequent overturning of the Philadelphia Baptist Association case by the decision in Vidal v. Girard's Executors.[5] For a brief interval Virginia may have repudiated its earlier position [6] but the principle of the Philadelphia Baptist Association case is apparently still the case law of Virginia despite local speculation to the contrary.[7]

Over the years Virginia has enacted many statutes in aid of charitable dispositions.[8] Of these, we are principally concerned with two—one, adopted in 1914 as an amendment to an existing statute relating to charitable trusts, and the other, adopted in 1946, to which reference has already been made. On its face the 1914 statute had no effect other than to save some charitable trusts which would otherwise have failed because the trustee was not a certain, natural person.[9] By contrast, the 1946 statute grants judicial powers of a nature traditionally associated with *cy pres*.[10] However, it was enacted subsequent to the effective date of the will of George B. West. Although it can be argued as a matter of statutory construction that the statute was intended to be retroactive in

4. Trustees of the Philadelphia Baptist Association v. Hart's Executors, 17 U.S. (4 Wheat.) 1, 4 L.Ed. 499 (1819). The doctrine of this case was adopted by Virginia in Gallego's Executors v. The Attorney General, 30 Va. (3 Leigh) 450 (1832).

5. 43 U.S. (2 How.) 127, 11 L.Ed. 205 (1844).

6. The Gallego and Philadelphia Baptist Association cases were apparently repudiated in Protestant Episcopal Education Society v. Churchman's Representatives, 80 Va. 718 (1885) and this latter case was followed in Trustees of the General Assembly of the Presbyterian Church v. Guthrie, 86 Va. 125, 10 S.E. 318 (1889). However, in Fifield v. Van Wyck's Executor, 94 Va. 557, 27 S.E. 446 (1897) the Supreme Court of Appeals brushed aside the language in the Churchman and Guthrie cases as dictum and reinstated Gallego as the leading Virginia authority.

7. The Gallego case has never been directly overruled. However, it has been widely recognized for some time that it is an open question whether the Supreme Court of Appeals would invoke the *cy pres* power in a proper case, Thomas v. Bryant, 185 Va. 845, 40 S.E.2d 487, 169 A.L.R. 257 (1946); Note, A Survey of Charitable Trusts in Virginia, 25 Va.L. Rev. 109 (1939); Fisch, The Cy Pres Doctrine in the United States (Matthew Bender & Co. 1950) 13–17. The Court of Appeals of Maryland has determined that a Virginia court would invoke the *cy pres* power or a doctrine of "liberal construction" to save a testamentary trust for the establishment of a home for the aged which would otherwise fail because of an insufficiency of funds, Fletcher v. Safe Deposit & Trust Co., 193 Md. 400, 67 A. 2d 386 (1949).

8. See 25 Va.L.Rev., supra, n. 7.

9. "55–26. Validity—
"Every gift, grant, devise or bequest which, since April second, eighteen hundred and thirty-nine, has been or at any time hereafter shall be made for literary purposes or for the education of white persons, and every gift, grant, devise or bequest which, since April tenth, eighteen hundred and sixty-five, has been or at any time hereafter shall be made for literary purposes or for the education of colored persons, and every gift, grant, devise or bequest made hereafter for charitable purposes, whether made in any case to a body corporate or unincorporated, or to a natural person, shall be as valid as if made to or for the benefit of a certain natural person, except such devises or bequests, if any, as have failed or become void by virtue of the seventh section of the act of the General Assembly passed on April second, eighteen hundred and thirty-nine, entitled 'an act concerning devises made to schools, academies, and colleges.' Nothing in this section shall be so construed as to give validity to any devise or bequest to or for the use of any unincorporated theological seminary. (Code 1919, § 587; 1954, c. 145)," Code of Virginia (1950).
This section was first construed in Fitzgerald v. Doggett's Executor, 155 Va. 112, 155 S.E. 129 (1930). The 1954 amendment effected an alteration which is not relevant to our problem.

10. Supra, n. 2.

effect by reason of the provision that it should not apply to or affect any trust or fund "which is the subject of pending litigation," [11] such a construction raises constitutional questions which, although resolved by the district court in favor of sustaining retroactive application of the statute, we find unnecessary to decide because of the application of the doctrine of equitable approximation, which we think is firmly implanted in the law of Virginia. We prefer to rest our decision on equitable approximation, because, unless clearly required to do so, we do not think that we should undertake to pass upon so delicate a matter of property rights until the Virginia courts have spoken in interpretation of the 1946 Virginia statute.

Aside from *cy pres*, which has application only to charitable trusts, courts of equity, both in England and the United States, have long been recognized to have power in proper circumstances either to alter or to add to the literal terms of a private or charitable trust so that the broad intent of the settlor may be saved from frustration. A trust, whether private or charitable, will not be permitted to fail for want of a trus-

tee. Similarly, the trust res may be sold or investments not authorized by the trust instrument may be made to preserve a trust threatened by changing external circumstances.[12] And the exercise of such powers as those to which reference has been made has been sanctioned not only after a trust has become operative, but also to make operative a trust deficient in some regard at its inception.[13] Thus, equity will authorize a trustee to designate beneficiaries or specific uses where the trust instrument is deficient in these respects.[14] Equity may also direct literal compliance with the terms of a trust instrument, even though unforeseen circumstances, such as insufficiency of funds, prevent fulfillment on the scale obviously contemplated by the settlor.[15]

In a jurisdiction in which the doctrine of *cy pres* is fully recognized, courts often perform saving operations under its umbrella, but all of the results which have been described have also been accomplished without resort to *cy pres*.[16] While equitable approximation is applicable to both private and charitable trusts, modern authorities suggest that the doctrine of equitable approximation is more extensive with respect to char-

11. Counsel agree that the quoted phrase referred to Thomas v. Bryant, supra, n. 7, which was then in litigation.

12. Restatement (Second), Trusts, § 167; Heusters v. Huntingdon College, 242 Ala. 272, 5 So.2d 777 (1942).

13. Thomas v. Bryant, supra, n. 7; see Duncan v. Higgins, 129 Conn. 136, 26 A. 2d 849 (1942).

14. Shannon v. Eno, 120 Conn. 77, 179 A. 479 (1935); Eckles v. Lounsberry, 253 Iowa 172, 111 N.W.2d 638 (1961).

15. In re Price's Will, 264 App.Div. 29, 35 N.Y.S.2d 111 (1942), aff'd. per curiam, 289 N.Y. 751, 46 N.E.2d 354 (1942); Jones' Unknown Heirs v. Dorchester, 224 S.W. 596 (Tex.Civ.App.1920); Wilson v. First National Bank, 164 Iowa 402, 145 N.W. 948 (1914); Wachovia Banking & Trust Co. v. Ogburn, 181 N.C. 324, 107 S.E. 238 (1921).

16. The opinions cited in notes 13–15, *supra*, all characterize the power exercised as not relying upon the *cy pres* doctrine or, at least, not necessarily relying upon the *cy pres* doctrine.

As previously suggested, the early uncertainty as to the availability and desirability of the judicial power of *cy pres* in an American context has left the courts of several states reluctant or historically embarrassed flatly to denominate the savings operations undertaken in their cases as exercises of *cy pres*. For example, the Connecticut court typically characterizes the power as "*cy pres* or equitable approximation" in the alternative, avoiding the necessity of distinguishing between the two doctrines. See, 23 Conn.B.J. 419, 420 (n. 6); Fisch, op. cit. *supra*, n. 7, 73–76.

itable trusts than to private trusts.[17] This is not to say that the doctrine of equitable approximation is completely co-extensive with the doctrine of *cy pres*. However, the conclusion seems inescapable that in jurisdictions where the courts have rejected the doctrine of *cy pres* they have been more liberal in application of the doctrine of equitable approximation to save charitable trusts, so that the scope of the two doctrines has tended to merge. Indeed, the authorities are replete with references to the two doctrines in the alternative, such as that of *"cy pres* or equitable approximation" in instances where deviations from the strict terms of a charitable trust have been authorized, as if both terms described the same judicial power.[18]

The Supreme Court of Appeals of Virginia has been in the forefront in giving broad scope to application of the doctrine of equitable approximation to charitable trusts. It has not limited the power merely to permitting minor variations in administration of trusts, but has utilized the doctrine to validate a testamentary trust which would have been impossible of performance at the time of its inception because of an insufficiency of funds to comply literally with the strict terms of the trust instrument, had literal compliance been deemed mandatory. Such a case is Thomas v. Bryant, supra, which the district court deemed inapplicable, but which we consider to be dispositive of the present litigation so long as "The Parker and Mary West Clinic" plan, or some counterpart, is available to appellee.

In Thomas v. Bryant the testator, Simmerman, died in 1939 leaving an estate valued at approximately $240,000.00.

After specific legacies, he apparently gave his wife a life estate in a residuary trust and directed his executor, after the death or remarriage of his wife, to apply and use all of the remainder of his estate " * * * in the building and maintenance of a home for destitute and dependent aged white people, * * *," naming the town and county in which the home was to be located, directing that the home be called "The George W. Simmerman Home for the Aged," and providing that legal title to the home "after it is erected" and the fund invested for its maintenance be vested in five trustees, having perpetual succession. Simmerman approximated the portion of the residue to be employed for the acquisition or erection of the building, furnishing and equipping the same, and directed the type of investments in which the balance of the residue should be placed. He gave his trustees wide discretion as to the kind, size and plan of the home, the rules and regulations for the admission of inmates, and the operation and management of the same, subject only to the direction that alcoholics, drug addicts or immoral persons might not be admitted.

Because Simmerman's widow renounced the will and took her statutory portion, the operative date of the charitable trust was accelerated and the corpus was reduced to $93,000.00, in cash, in addition to the testator's former residence, which was located in the county and town in which he had directed the "George W. Simmerman Home for the Aged" to be erected and maintained, but which was in need of substantial repairs. From evidence adduced, it was clear that it would not be possible to establish and maintain on a large scale a home for the

---

17. See IV Scott, Trusts (2d Ed.1956), § 381; Bogert, Trusts (2d Ed.1964), § 433; Annot., 169 A.L.R. 266 (1947).

In this connection it should be mentioned that the district court in determining that legislative *cy pres* was available, of necessity, determined that the will of George B. West manifested a general charitable intent. Indeed, the district judge devoted a substantial portion of his opinion to a discussion of this point, reviewing general authorities as well as applicable Virginia decisions. We concur in and adopt the district court's findings of fact and legal conclusion that George B. West manifested a general charitable intent.

18. E.g., In re Williams' Estate, 353 Pa. 638, 46 A.2d 237 (1946); Duncan v. Higgins, supra, n. 13.

care of destitute and dependent aged white people, but it was shown that if Simmerman's former residence were used as a home the trust could be set up and carried out with the anticipated revenue (stipulated to be approximately $2,250.00 per year), and thus care for a small number of inmates, particularly since the board of supervisors of the county had promised to lend aid in the operation of the home by donations of food and supplies from the county farm.

The holding of the court appears from the following succinct statement (185 Va. p. 855, 40 S.E.2d p. 491):

> "In the present case we hold, without resorting to the *cy pres* doctrine, that the use of the residence of the testator and the fund set aside for the maintenance of the Simmerman Home, so far as possible, are within the expressed plan of the testator and should be carried out to the extent of the fund provided. In re Price's Will, supra [35 N.Y.S.2d 111, (264 App.Div. 29 (1942), aff'd. 289 N.Y. 751, 46 N.E.2d 354 (1942.))]

> "Should the income from the trust fund be augmented by outside donations and assistance, such as that promised by the local board of supervisors, so much the better. Such donations would in no manner trespass on the intent of the testator or violate the terms of the trust."

Although not significant here, the court also decided that the trust was not invalid *per se* for indefiniteness, and that the trust did not violate the rule against perpetuities.

In re Price's Will, relied upon in Thomas v. Bryant, concerned a charitable trust to provide a home for retired Presbyterian ministers and their wives. The testatrix left her farm, and its furnishings and other personal property, to trustees for that purpose. She directed that certain personal property be invested and the income applied to the maintenance and operation of the home. Interestingly enough, she made a gift over in case the trust should fail or become impossible of realization, by providing that in either of such events the farm should go to Elmira College. The evidence showed that the income from the fund set aside for the support and maintenance of the home would amount to approximately $2,500.00 to $2,800.00. Notwithstanding the insufficiency of the income to afford accommodation for all or a substantial number of the persons eligible to enjoy the bounty of the testatrix, the court saw no reason why the trust should not become effective for the benefit of as many as might be accommodated within the limits of its economic resources. In reaching this result, the court specifically stated that, although the *cy pres* doctrine is part of the law of New York, it could not be relied upon to save the trust since the testatrix had provided for a gift over to Elmira College in the event of the failure of the charitable use.

Like the case at bar, Jones' Unknown Heirs v. Dorchester, 224 S.W. 596 (Tex. Civ.App.1920), also relied upon in Thomas v. Bryant, dealt with an insufficiency of funds to construct a memorial hospital as the object of a charitable trust. Because the testator's widow elected to take against the will, the corpus of the trust was reduced to $100,000.00 from an anticipated $300,000.00. It was contended that the trust failed because the fund would not build the kind of hospital the testator had contemplated, but the gift was held valid. In reaching this result, the court made the following significant statements, first (p. 604),

> "In an early case in Texas the *cy pres* rule as recognized by the English courts was not in terms approved, but the courts of this state exercise an original and inherent jurisdiction over charities upon the principles of the statutes and in obedience to the doctrine of approximation."

It was added (p. 605):

> " * * * [i]t was the duty of the court, under the rule of approximation, to enforce the trust as declared,

if it could be reasonably done, although in a more modest degree than, according to appellant's contention, the testator contemplated at the time he executed his will."

■ These two cases, fully approved in Thomas v. Bryant, supra, make clear the breadth of its holding. Viewed in this light, and the light of a clear expression that charitable gifts are viewed with favor by the Virginia courts and every presumption consistent with the language of the donor will be employed to sustain them,[19] we are persuaded that Thomas v. Bryant, supra, is direct authority for sustaining the validity of the West-Smith charitable dispositions under the doctrine of equitable approximation. If made effective, "The Parker and Mary West Clinic" plan would literally depart from the West testamentary instructions only to the extent that (1) the building to be erected would be a wing of a larger complex, rather than a separate building, (2) the inscription over its entrance would be "The Parker and Mary West Clinic," rather than "The Parker and Mary West Hospital," and (3) record title to "The Parker and Mary West Clinic" would be vested in the Riverside Hospital corporation rather than the corporation the original testator directed to be formed. Where, by equitable approximation, the Virginia court, in Thomas v. Bryant, approved the substitution of an existing residence, badly in need of repairs, for a new structure contemplated by the testator, we think the law of Virginia would permit the substitution of a wing, having a separate outside entrance, in a larger building, for a separate building. We do not think that the designation "Clinic" for the designation "Hospital" is a sufficient departure from the testator's purpose of creating a memorial when the essence of the memorial "Parker and Mary West" is fully preserved to conclude that the trusts have failed.[20] No less do we think that the matter of record title falls outside the scope of equitable approximation when the directors of the Riverside Hospital will be the same persons who are the directors of the corporation West directed to be formed. Their identity of interest for the foreseeable future, if "The Parker and Mary West Clinic" plan is consummated between Riverside Hospital on the one hand, and the clinic, on the other, is such as to constitute the matter of record title a distinction without a difference.

■ Thus, we conclude that the West-Smith charitable dispositions do not fail, and the lower court should enter a decree approving "The Parker and Mary West Clinic" plan, assuming that there has been no change of position on the part of the present trustees of the new Riverside Hospital during the pendency of this appeal. Should there have been a change in position, and should no other plan amenable to the doctrine of equitable approximation be presented, we can again consider the question of whether legislative *cy pres* may be invoked and by whom, issues which the district court thought necessary to decide. Absent such necessity, and absent prior consideration of the meaning of the Virginia statutes by the Supreme Court of Appeals of Virginia, we conclude that the case should be remanded to the district court for entry of a decree in conformity with the views we have expressed.

Remanded for further proceedings in accordance with opinion.

19. Thomas v. Bryant, supra, n. 7, 185 Va. 852, 40 S.E.2d 487.

20. We take judicial notice that one of the nationally best known general hospitals is commonly called the "Mayo Clinic" and that the no less famous Johns Hopkins Hospital has among its component parts, the "Marburg Clinic" (a general private hospital), the "Phipps Clinic," the "Wilmer Clinic" and the "Brady Clinic" (specialized private and non-private hospitals), although the latter two are also called the "Wilmer Institute" and the "Brady Institute," respectively.