# Staunton

W. T. Moore, Executor & Trustee v. Lucinda
Perkins, et als.

September 23, 1937.

Present, All the Justices.

The opinion states the case.

*George P. Young* and *S. B. Campbell,* for the appellant.

*Robert L. Kirby, Jr., W. B. Kegley, W. P. Parsons, J. M. Parsons* and *Showalter, Parsons, Kuyk & Staples,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

This appeal brings under review the decision of the lower court holding that the residuary clause in the will of Lucinda Hale Nuckolls is invalid. The clause in question reads:

"All money remaining from above mentioned sale I wish to be administered by Rev. W. T. Moore, my present Pastor, in whom I place full authority and power to act as follows. I wish him to place said money in a safe place where it will draw a reasonable interest, said interest to be paid by said W. T. Moore to the Methodist Church South for missionary work where he thinks it will do the greatest good. In the event of the death of W. T. Moore I ask that Rev. M. P. Carico take his place, but if W. T. outlives M. P. Carico, W. T. Moore may appoint his successor."

Appellant, W. T. Moore, as executor and trustee, contends that the trial court erred, and that the will is valid for any one or all of the following reasons: (1) That the gift is validated by the provisions of Code, section 38; (2) that the bequest is one to charity, and is valid under section 587 of the Code; and (3) that the gift, in effect, is to the Board of Missions of the Methodist Episcopal Church South, a body corporate charged with complete administration of all missions in the church.

The mere statement of the assignments of error is an admission that the bequest is invalid unless validated by statute, or a corporation is the ultimate beneficiary. It is well settled in this Commonwealth, by decisions running back more than a hundred years, that a trust for indefinite beneficiaries, if the named trustee is an individual or an unincorporated body, is invalid unless expressly validated by statute. See *Fitzgerald* v. *Doggett's Ex'r*, 155 Va. 112, 155 S. E. 129, 136; *Gallego's Ex'rs* v. *Attorney General*, 3 Leigh (30 Va.) 450, 24 Am. Dec. 650.

The statutory provisions, now Code, section 38, were adopted in 1841 (Acts 1841-42, ch. 102) following the suggestion made in Judge Tucker's opinion in the *Gallego Case*. These provisions were codified in 1849, chapter 77, section 8, and were as follows: "Every conveyance, devise or dedication, shall be valid, which since the first day of January, seventeen hundred and seventy-seven, has been made, and every conveyance shall be valid which hereafter shall be made, of land for the use or benefit of any religious

congregation as a place for public worship or as a burial-place or a residence for a minister; and the land shall be held for such use or benefit, and for such purpose and not otherwise."

Soon after these acts were passed the question arose as to the meaning of "religious congregation" as used therein. In *Brooke* v. *Shacklett,* 13 Gratt. (54 Va.) 301, 313, it was held that "The benefits which these acts confer are intended for any and every religious congregation, without regard to the peculiarities .of religious faith or the forms of church government. It is, however, equally obvious that the conveyances, devises and dedications to which the acts mean to give validity, are conveyances, devises and dedications of property for the use of the 'religious congregations' therein mentioned, in the limited and local sense of the term, viz: for the members (of these religious congregations) as such, who, from their residence at or near the place of public worship, may be expected to use it for such purpose. This interpretation is to be drawn from the general tenor of the acts, but more especially from the language of those portions of them that stand in the Code as the eighth and tenth sections of the chapter before referred to. The dedications of real estate must be made for the use of the 'religious congregation, as a place for public worship, or as a burial place, or a residence for a minister;' and that of the 'books and furniture,' 'for the benefit of such congregation, to be used on the said land in the ceremonies of public worship, or at the residence of their minister'; uses, which it is plain, from their very nature and the connection in which they are mentioned, must belong peculiarly to the local society, 'the religious congregation' at or near the locality of the property conveyed. No dedication of property to religious uses, which does not respect these rights of the local society or religious congregation, no deed which does not design such enjoyment of the uses of the property conveyed, by the local religious society or congregation, can be placed within the influence and protection of the statutes."

This interpretation was reaffirmed in *Seaburn's Ex'r* v. *Seaburn*, 15 Gratt. (56 Va.) 423. In each of the above cited cases this court was confronted with the same contention that appellant now urges; namely, that the term "religious congregation," as used in the statute means any entire unincorporated body of believers belonging to one denomination.

Counsel recognizes the force of the interpretation placed upon the statute by this court in the cases cited, but contends that subsequent amendments enlarged the term "religious congregation" to include the whole denomination.

The first amendment to this section was by chapter 107 of the Acts of 1867. This amendment simply enlarged the use, or trust, validated, to include the residence of a bishop or clergyman, who, although not in charge of the local congregation, was an officer of such church, or religious society employed under its authority and about its business.

In *Fifield* v. *Van Wyck*, 94 Va. 557, 27 S. E. 446, 64 Am. St. Rep. 745, the wording of the bequest is practically the same as it is in the present case. It was held that the purposes of the trust were wholly undefined, and that the discretion vested in the trustee was unlimited, and that if the trustees were unable, or for any reason failed to act, it was impossible for a court of equity to enforce it.

Counsel for appellant concedes that under the rule announced in the *Van Wyck* and other cases, the bequest of the testatrix is invalid, but he contends that the rule adopted is wrong, and should not be followed. As we stated in the *Doggett Case*, whatever may be the rule in other jurisdictions, the principle announced in the *Gallego Case*, and reiterated in the *Van Wyck* and other cases, has been too long established in Virginia for this court to undertake to change it.

It is significant to note that while the provision of the statute has been amended from time to time, there has been no material change in the language of the first part of the statute. The legislature (Acts 1901-02, ch. 323, p. 336) added the following provision:

"And no gift, grant, or bequest hereafter made to such church or religious congregation, or the trustees thereof, shall fail or be declared void for insufficient designation of the beneficiaries in, or the objects of, any trust annexed to such gift, grant, or bequest in any case where lawful trustees of such church or congregation are in existence, or said congregation is capable of securing the appointment of such trustees upon application as prescribed in section thirteen hundred and ninety-nine; but such gift, grant, or bequest shall be valid, subject to the limitation of section fourteen hundred and three; provided, that whenever the objects of any such trust shall be undefined, or so uncertain as not to admit of specific enforcement by the chancery courts of the Commonwealth, then such gifts, grant, or bequest shall enure and pass to the trustees of the beneficiary congregation, to be by them held, managed, and the principal or income appropriated for the religious and benevolent uses of said congregation, as said trustees may determine, by and with the approval of the vestry, board of deacons, board of stewards, or other authorities which, under the rules or usages of such church or congregation, have charge of the administration of the temporalities thereof."

In the first sentence of the statute as amended in 1867, "church" is used alternately with "religious society." In the 1901 amendment, "church" is used alternately with "religious congregation," which terms, as stated, were construed, in the cases cited, to apply to the local congregation, and not to the church at large in its denominational sense. This restricted meaning is further evidenced in the subsequent proviso—that where the objects of "such trust" are so undefined that the chancery courts of the Commonwealth cannot enforce them, then the gift shall enure to the trustees of the beneficiary congregation, and the principal and income appropriated for the religious and benevolent uses of said "congregation" as the trustees, with the approval of the vestry, board of deacons, board of stewards

(all of whom are local functionaries) or other similar authorities may determine.

Subsequent provisions of this act, now sections 39 to 46 (as amended), clearly indicate that it is contemplated that the trustees to whom title to such gifts shall enure shall be individual trustees of the local congregation.

By Acts of 1916 (Acts 1916, ch. 81, p. 136) this section was again amended. This amendment merely added to the purposes for which such conveyances would be valid: land for the location of a parish house, meeting of societies or committees of the church, or others, in the transaction of business connected with the church, or the cemetery of the church, "provided such land lies adjacent to or nearby the lot or land on which is situated the church to which it is designed to be appurtenant." These restrictive provisions within the chapter, as it now stands, clearly indicate that the words "church" or "religious congregation" are used in a local sense.

Section 43 of the same chapter (as amended by Acts 1926, ch. 514, and Acts 1930, ch. 265), limits the amount of property that such trustees may hold for a church or religious congregation to four acres of land in the city, seventy-five acres in the country, and $100,000 in personal property. If the words "church" or "religious congregation" were construed to mean a denomination, such as the Methodist Episcopal Church, South, composed of 2,700,000 members, or even the whole membership of the denomination in Virginia, it would limit the denominational holdings in this State to a very small sum, indeed insignificant compared with the number of local churches now existing. This section further provides "that where two or more * * * religious societies shall merge or consolidate, such religious congregations, churches, or religious societies so merged, or consolidated, shall have three years in which to dispose of its land in excess of that which it is permitted to hold under this section."

The conclusion is inevitable that the words *church, religious congregation,* or *religious society,* as used in the

statute, mean a local unincorporated body. Hence the provisions of section 38 do not apply to the clause of the will in question.

Appellant contends that even if the gift does not come within the purview of the statute dealing with trusts for religious purposes, it does come within the provisions of section 587. This statute, as originally drawn, dealt primarily with trusts for literary and educational purposes. See Acts 1839, pages 11, 12 and 13; Acts 1840-41, page 54. It now reads, with the 1914 amendment (ch. 234) in italics, as follows:

"Every gift, grant, devise or bequest which, since the second day of April, in the year one thousand eight hundred and thirty-nine, has been, or at any time hereafter shall be, made for literary purposes, or for the education of white persons within this State, and every gift, grant, devise, or bequest which, since the tenth of April, in the year one thousand eight hundred and sixty-five has been, or at any time hereafter shall be, made for literary purposes, or for the education of colored persons within this State, *and every gift, grant, devise or bequest hereafter made for charitable purposes,* whether made in any case to a body corporate or unincorporated, or to a natural person, shall be as valid as if made to or for the benefit of a certain natural person, except such devises or bequests, if any, as have failed or become void by virtue of the seventh section of the act of the General Assembly passed on the said second of April, eighteen hundred and thirty-nine, entitled 'an act concerning devises made to schools, academies, and colleges.' Nothing in this section shall be so construed as to give validity to any devise or bequest to or for the use of any unincorporated theological seminary."

The decision in the *Gallego Case* emphatically declared that no charitable trust was valid in this jurisdiction. While the decision makes no distinction between a trust for religious use, and a trust for any other charitable purpose, the evil resulting from trusts for religious purposes was emphasized in the opinion. It was there suggested that if the

people of the Commonwealth desired to legalize any such trust, it should be done through legislative enactment. Following this suggestion the legislature, in validating charitable trusts, made a marked distinction between trusts for religious purposes and trusts for literary or educational purposes. See chapters 77 and 80 of the Code of 1849, and chapters 64 and 65 of the Code of 1887.

Counsel for appellant contends, as has been done before, that the decision in the *Gallego Case* was wrong, because in the course of the opinions reference was made to the opinion of Chief Justice John Marshall in *Philadelphia Baptist Association* v. *Hart's Ex'r*, 4 Wheat. 1, 4 L. Ed. 499, in which the great Chief Justice said that in his opinion charitable trusts were not enforced in the English Chancery courts prior to the statute of 43 Elizabeth. That statement was challenged and held erroneous by Mr. Justice Story in *Vidal* v. *Girard's Ex'r*, 2 How. 127, 11 L. Ed. 205.

We are not now concerned, except for historical accuracy, with the mistake, if it was a mistake, of Chief Justice John Marshall. It now seems clear that there was much confusion in the English law on the subject, prior to the adoption of the statute.

In *Wheeler* v. *Smith*, 9 How. 55, 77, 13 L. Ed. 44, this is said: "Charities have been administered, both at common law and in chancery, from an early period of English jurisprudence. But the earlier decisions in that country are often inconsistent, and of no great weight of authority."

"By this litigation the domain of charity by mere wayward instinct came to an end, and the reign of more intelligent action was ushered in." Zollmann, American Law of Charities (1924), p. 15. See Perry on Trusts and Trustees (7th Ed.) secs. 687 to 696.

Judge Tucker did not base his decision in the *Gallego Case* entirely on the opinion of Chief Justice John Marshall in the *Philadelphia Baptist Association Case,* he advanced his own independent reasons for the conclusions reached. In the course of his opinion he said: "A just respect to

the policy of the legislature, in relation to religious charities especially, a prudent caution on our part, in assuming doubtful powers; a due sense of the infinite difficulty and embarrassment, which must attend the search after the common law doctrines anterior to the statute of Elizabeth; and a just view of the danger of reviving those obsolete doctrines;—must determine us to leave the subject to the wisdom of the legislature itself."

In *Kelly* v. *Love's Adm'rs,* 20 Gratt. (61 Va.) 124, in construing the very section of the Code into which "charitable purposes" was carried by the amendment of 1914, the court said: "I think the object of the legislature, in passing the act, was to change the rule of law laid down in the cases before cited (the *Gallego Case* and others), controlling bequests and devises for the establishment of schools and colleges, *leaving it in full effect and operation, so far as it applied to bequests and devises for religious purposes.* This adherence to the rule in the latter case, originated in legislative and popular jealousy, and opposition to the incorporation of religious societies, and a *just* apprehension that the accumulation of property by such institutions would be incompatible with sound republican policy." (Italics supplied.)

The principles announced have been consistently followed by this court from the time they were declared in 1832 until the present. It is true that in two cases, *Trustees, etc.* v. *Guthrie,* 86 Va. 125, 10 S. E. 318, 6 L. R. A. 321, and *Protestant Episcopal E. Society* v. *Churchman's Rep.,* 80 Va. 718, the decision was criticized. Prior to the criticisms in the above cases Judge Daniel (1856) in *Brooke* v. *Shacklett, supra,* 13 Gratt. (54 Va.) 301, at page 310, said: "I do not deem it at all necessary to inquire how far the decision in the case just cited (the *Gallego Case*) may conform to the views of courts elsewhere in respect to this branch of the law, inasmuch as I am not aware that the authority of the case as a *true exposition* of the law in this state, has ever been seriously questioned." (Italics supplied.)

After the criticism of, and the attempt to override the *Gallego Case* was made, Judge Buchanan in *Fifield* v. *Van Wyck, supra,* 94 Va. 557, at page 570, 27 S. E. 446, 450, 64 Am. St. Rep. 745, speaking of that criticism, said: "Their *dicta* announce views contrary to a long line of decisions of very able judges, * * *.

"We are unwilling to hold that this line of decisions, running back over a period of more than fifty years, was overturned by expressions of opinion in the *Churchman* and *Guthrie Cases,* not necessary to their decision. If further changes are necessary or desirable, upon the subject, the Legislature, the law-making power, and not the courts, should make them."

Notwithstanding the fact that in two cases members of the court had criticized the opinion in the *Gallego Case,* and that subsequently Judge Buchanan had condemned the criticism, the marked distinction in the Acts of the General Assembly in dealing with trusts for religious purposes and trusts for other charitable purposes has been rigidly maintained.

The present Constitution prohibits the General Assembly from incorporating any church or religious denomination, but permits such an organization to acquire a limited amount of property. (Section 59.) The Constitution further prohibits the General Assembly from appropriating any public funds for the benefit of any church, sectarian society, association or institution of any kind whatever, which is entirely or partially, directly or indirectly, controlled by any church or sectarian society, nor is the General Assembly permitted to make any appropriation to any charitable institution which is not owned or controlled by the State. (Section 67.)

There is no limitation on the amount of personal or real property that may be acquired for charitable trusts for educational or literary purposes, or for any other charitable purpose within the purview of section 587, such as is imposed by both the Constitution and chapter 7, Code of Virginia 1919 (section 36 et seq.), restricting the accumula-

tion of property by religious societies and benevolent associations.

It is difficult to define, with accuracy, the meaning of the phrase "charitable uses." The definition usually accepted is found in *Jackson* v. *Phillips*, 14 Allen (Mass.) 539, 556, and quoted with approval in *Protestant Episcopal E. Society* v. *Churchman, supra.* In this broad definition of the term the gift here in question would be validated if the literal meaning be given to the 1914 amendment to section 587, validating "every gift, grant, devise or bequest hereafter made for charitable purposes."

But, as pointed out above, section 587 deals primarily with charitable trusts for literary and educational purposes. The phraseology of the statute, as originally drawn, has been maintained through the successive reenactments of the legislature since 1839. Some of the restrictions imposed upon trusts for religious purposes have been eliminated from time to time, but some still remain and are found in the Constitution and in chapter 7 of the Code of 1919. It could hardly be the intent of the legislature, in the use of the words "charitable purposes," as set forth in section 587, to remove all restrictions upon trusts for religous purposes without specifically amending other sections of the Code dealing with that subject.

The history of this section, and the different Virginia cases construing it, were reviewed in the case of *Fitzgerald* v. *Doggett's Ex'r, supra,* and need not be here repeated. The present holding was foreshadowed in that case, as it was said: "In deciding the questions raised on this appeal, we have excluded from consideration that class of gifts, devises and donations which is controlled by chapter 7 of the Code of 1919 (sections 36-61)."

The prior decisions of this court and the manner in which the legislature has dealt with the subject, fully support Judge Harrison in his statement, as found in Harrison on Wills and Administration (section 214) thus: "It (section 587) does not seem to affect religious donations or beneficial orders and associations. It can hardly be sup-

posed that the Legislature intended to repeal the sections which elaborately provide how far religious trusts are valid or trusts in favor of beneficial orders are valid by an amendment to a section applicable only to educational and literary trusts. Therefore, it can be safely said that religious donations are not affected by the Act, but are controlled by the sections of the Code specifically made applicable to them."

Appellant's final contention is that without statutory aid the gift is valid because it is in effect a gift to the Board of Missions of the Methodist Episcopal Church South, a corporation chartered under the laws of Tennessee.

With this contention in mind we turn to the language in the will and find that it reads: "All money remaining * * * I wish to be administered by Rev. W. T. Moore * * * in whom I place full authority and power to act as follows: I wish him to place said money where it will draw a reasonable interest, said interest to be paid * * * to the Methodist Church South for missionary work, where he thinks it will do the greatest good."

It is conceded that testatrix in her reference to the denomination intended to name the Methodist Episcopal Church South, the name adopted in May, 1845, at the meeting of representatives of 13 annual conferences held in Louisville, Kentucky. This name designates and distinguishes the followers of John Wesley living in the south from his followers living in the north, who then, and now, are known as the Methodist Episcopal Church. For the purpose of organizing and to promote efficiency in religious activity, according to their religious tenets, this denomination is divided into local churches, districts, Annual Conferences, and the General Conference. The General Conference has one regular meeting every four years in which all communicants are represented through delegates chosen at the preceding Annual Conference. All the communicants are governed by a set of rules and regulations called the "Doctrine and Discipline of the Methodist Episcopal Church South." At the request of the General Conference,

in 1915, certain members obtained, under the laws of Tennessee, a charter, for the conference, called the "Board of Missions of the Methodist Episcopal Church South." The object of this corporation, as set forth in its charter, "is to provide for the support of public worship, the building of schools, churches, and chapels, and the maintenance of all Missionary undertakings; to provide for the support of superannuated missionaries, and the widows and orphans of Missionaries, who may not be provided for by any annual conference, to print books for the Indian, German, Mexican and other Foreign Missions, under the direction and according to the law of the said Methodist Episcopal Church, South, * * * ."

The charter was amended in 1917 for the purpose of investing in said corporation the power "to receive property, real, personal, or mixed, by gift, devise or bequest, and to sell and apply the proceeds to the promotion of the business for which the corporation was created and to hold any such property and apply the income and profits toward said business." Undoubtedly the corporation had charter power to receive the donation for the purpose stated in the will. However, the testatrix did not name the corporation, nor is all of the missionary activity of the Methodist Episcopal Church South done through this corporation. Section 513 of the Doctrine and Discipline provides that the board "shall have charge of all foreign missions of the church and of such missions in the home fields as are not provided for by the annual conferences." While there is only one General Conference of the members, which, as stated, meets once in four years, there are a number of annual conferences.

The beneficiary is not the Board of Missions of the Methodist Episcopal Church South, a corporate body, but the gift is to a natural person as trustee for such missionary work as conducted through the whole denomination, and then only such as the trustee thinks "will do the greatest good." If the corporation was the means or the instrument through whom the missionary work was to be advanced by

the gift in question, why did it not seek to become a party to this suit? Several of its officers were called as witnesses and testified in behalf of appellant.

If Mr. Moore, in the exercise of his plenary discretion under the will, failed or refused to pay any part of the interest on the $15,000 available from the sale of testatrix's land to the Board of Missions, it would have no legal right to enforce payment of any part of the income. Moore might himself become a missionary, either at home or in foreign fields, and in exercising his discretion he might spend all the income on himself or his family. If he did, who would have the legal right to question the exercise of such discretion? The Board of Missions has no such right. No specific one of the number of annual conferences had any such right, even if a donation to such an unincorporated body were valid.

This is not a gift of a corpus to a trustee for distribution among charitable objects as was the case in *Moore* v. *Downham,* 166 Va. 77, 184 S. E. 199. The gift is to a trustee for an indefinite purpose, i. e., for missionary work within the scope of the Methodist Episcopal Church South, and as such he might select, during his life, a successor empowered to continue to distribute the income, but there is no disposition of the corpus to the estate. It passes to no one under the will. While this fact is not controlling, it emphasizes the uncertainty of the intention of the testatrix as expressed in her will.

In *Adams* v. *Cowan,* 160 Va. 1, 168 S. E. 750, 751, the clause of the will considered provides: "The remainder of my property, if all debts are paid, I wish to go to the relief of the poor, * * * through proper channels of the Presbyterian Church." Justice Browning, in passing upon the validity of that clause, said: "It is conceded by all parties in interest that (this) clause * * * is void for uncertainty. That this is so seems perfectly manifest, hence we will make no further mention of it." A trust "for missionary work" is no more definite than a trust "for the relief of the poor."

■ There is nothing in the will, nor in the extrinsic evidence, which shows that the corporation, which is not making any claim for the bequest, but for which the claim is made by the trustee, is intended to be the beneficiary.

■ References are made in the briefs to Code, section 6298a, as added by Acts 1934, ch. 397, as amended in 1936 (chapter 341). The will was probated July 21, 1933. For this and other reasons the provisions of this section have no application to the will in question.

The decree of the chancellor is affirmed.

*Affirmed.*