ESTATE OF FLORENCE H. LAWLER, DECEASED, J. EDWARD LAWLER, COEXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4584-66. Filed May 15, 1969.

*L. Paul Byrne* and *C. Braxton Valentine, Jr.*, for the petitioner.
*E. M. Paturis*, for the respondent.

272

OPINION

Respondent disallowed a part of the charitable deduction claimed by petitioner, as executor of the Estate of Florence H. Lawler, on decedent's Federal estate tax return. It is respondent's contention that the gift of "Fund C" under the terms of the Florence H. Lawler Trust, which trust was included in decedent's gross estate, is invalid under Virginia law and, therefore, the Estate of Florence H. Lawler is not entitled to a charitable deduction for the value of "Fund C" in computing its Federal estate tax. Respondent agrees that if the gift is valid under the law of Virginia it is a proper deduction from decedent's adjusted gross estate.

Our decision on this issue rests largely on the law of Virginia; we therefore deem it advisable to touch briefly on the foundations of Virginia jurisprudence regarding charitable bequests.

In *Baptist Association* v. *Hart's Executors*, 4 Wheat. 1 (1819), the Supreme Court, speaking through Chief Justice Marshall, held that the charitable bequest of a Virginia testator could not be established by a court of equity, independent of the statute of 43 Eliz., ch. 4 (often referred to as the Statute of Charitable Uses), and since the statute of 43 Elizabeth was repealed in 1792 by Virginia's general repeal of Eng-

lish Statutes, the bequest was void. Twenty-five years later the Supreme Court, in *Vidal et al. v. Girard's Executors*, 2 How. 126 (1844), distinguished the *Hart* decision and noted that the English Court of Chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth.[3]

In the interim, between the *Hart* and *Vidal* decisions, the Supreme Court of Appeals of Virginia decided *Gallego's ex'ors* v. *Attorney General*, 3 Leigh 450, 30 Va. 487 (1832). In *Gallego* it was held that a trust for indefinite beneficiaries was invalid and that indefinite bequests for charitable purposes could only be sustained under the statute of 43 Elizabeth, which was repealed by the State of Virginia in 1792.

Although *Gallego* was decided before *Vidal*, the Gallego court did not rely entirely on the opinion of Chief Justice Marshall in *Hart*. Speaking for the court in *Gallego*, Judge Tucker stated (30 Va. at 516–517):

a just respect to the policy of the legislature, in relation to religious charities especially; a prudent caution on our part, in assuming doubtful powers; a due sense of the infinite difficulty and embarrassment, which must attend the search after the common law doctrines anteriour to the statute of Elizabeth; and a just view of the danger of reviving these obsolete doctrines;—must determine us to leave the subject to the wisdom of the legislature itself. * * *

As an aftermath to Judge Tucker's opinion in *Gallego*, the Virginia legislature in 1839 and in 1841 promulgated statutes validating charitable (literary and educational) and religious gifts respectively. These statutes were the predecessors of what is presently section 55–26 and section 57–7 of the Virginia Code of 1950. The legislature, however, fearful that an accumulation of wealth by religious institutions would result in an intermeddling in the affairs of government, permitted only transfers of realty and restricted the quantity of said transfers. Beginning in 1902, and by subsequent amendments, the Virginia legislature authorized gifts of specific amounts of personalty to religious institutions (presently sec. 57–12). See *Maguire* v. *Loyd*, 193 Va. 138, 67 S.E. 2d 885 (1951).

Although the Supreme Court's opinion in *Hart*, was subsequently reexamined in *Vidal* and found to be erroneous, the Virginia Court of Appeals' decision in *Gallego*, that a trust for indefinite beneficiaries

---

[3] "In the struggle with the pope, Henry VIII. was obliged to attack many charitable institutions for the purpose of asserting the power of the crown as against the claim of papal supremacy; and hence many charities were abolished by statute.⁴ But in the reign of Elizabeth, after the conflict for ecclesiastical supremacy had been settled in favor of the English monarch, and the success of the Reformation had been assured, the necessity for institutions of an eleemosynary character began to re-assert itself, and several statutes were passed for the purpose of restoring and encouraging charitable foundations.⁵ These acts finally culminated, in the year 1601, in the Statute of Charitable Uses * * *." (Bispham, Principles of Equity, sec. 118, p. 186 (5th ed. 1893). Fns. omitted.)

274

could only be validated by an act of the legislature, remains today as a viable doctrine of Virginia jurisprudence. See *Moore* v. *Perkins*, 169 Va. 175, 177, 192 S.E. 806, 807 (1937); *Maguire* v. *Loyd, supra;* and see *Smith* v. *Moore*, 343 F. 2d 594, 599–600 (C.A. 4, 1965).

In line with Virginia's fear of organized religions intermeddling in the affairs of government, the present constitution of Virginia provides in article IV, section 59, that "The General Assembly shall not grant a charter of incorporation to any church or religious denomination, but may secure the title to church property to an extent to be limited by law." Although this provision first appeared [4] in the constitution of 1850, and was subsequently included in each succeeding constitution,[5] its germination may be traced to the Revolution and the Bill of Rights wherein the church and state were disestablished. Thus, the purpose of this constitutional provision was to reaffirm the separation of church and state and not to prevent the holding of property by organized religion. *Trustees Gen. Assem. Presbyterian Church U.S.* v. *Guthrie*, 86 Va. 125, 10 S.E. 318, 322 (1889). Accordingly, the incorporation of church agencies essential to the accomplishment of church work has been held not to be the incorporation of a church and, therefore, a bequest to such an organization is not rendered invalid. *Trustees Gen. Assem. Presbyterian Church U.S.* v. *Guthrie, supra.* Thus, in Virginia today, title to church property may be secured to an extent limited by law, however, both charitable and religious trusts for the benefit of indefinite beneficiaries must be validated by an act of the legislature.

Accordingly, under the law of Virginia, charitable bequests, exclusive of transfers to religious organizations, are validated by section 55–26 of the Virginia Code of 1950 (hereinafter referred to as section 55–26). Transfers to lay trustees for religious organizations are validated by section 57–7 of the Virginia Code of 1950 (hereinafter referred to as section 57–7) and limitations upon the quantity of realty and personalty that said trustees may hold under section 57–7 are imposed by section 57–12 of the Virginia Code of 1950 (hereinafter referred to as section 57–12). Provision is also made under section 57–16 of the Virginia Code of 1950 (hereinafter referred to as section

---

[4] The 1830 constitution of Virginia, art. III, sec. 11, provided that "the legislature shall not prescribe any religious test whatever; nor confer any peculiar privileges or advantages on any one sect or denomination; nor pass any law requiring or authorizing any religious society." See 7 Thorpe, American Charters Constitutions and Organic Laws (1492–1908), sec. 11, p. 3824.

[5] See *Thorpe, supra* at 3842, 3862, 3886, 3915.

57–16) for the acquisition of property by an appointed bishop, minister, or other ecclesiastical officer whenever the laws, rules, or ecclesiastical polity of any church commits to said bishop, minister, or ecclesiastical officer authority to administer its affairs. This section was enacted in 1942.

Petitioner contends that Fund C of the trust constitutes a valid charitable bequest under section 55–26.[6] To support his contention, petitioner argues that the main purpose of Fund C is "missionary purposes of the Diocese of Richmond" and, therefore by definition, is not a gift to a religious institution which would be governed by section 57–7.

Petitioner's attempt to categorize Fund C as a charitable bequest under section 55–26 through the use of the word "missionary" must fail. The whole tenor of Fund C indicates that the bequest was not intended to be totally nonsecular. To accept petitioner's argument, therefore, would be to circumvent the intent of the Virginia legislature as expressed in sections 57–7, 57–12, and 57–16. Moreover, we find support for this analysis in *Moore* v. *Perkins, supra,* where the Supreme Court of Appeals of Virginia held that a bequest of money to be administered by a named pastor, who was to pay the interest earned on said money "to the Methodist Church South for missionary work where he thinks it will do the greatest good," did not fall within section 55–26. In *Perkins,* the court recognized the dichotomy in Virginia between bequests and devises for religious purposes and bequests and devises for charitable purposes. The court observed that section 55–26 was intended to deal primarily with charitable trusts for literary and educational purposes, while religious donations were to be controlled by the sections of the Virginia Code specifically made applicable to them and, therefore, the bequest in *Perkins* "for missionary work"

---

[6] Sec. 55–26. Validity.—Every gift, grant, devise or bequest which, since April second, eighteen hundred and thirty-nine, has been or at any time hereafter shall be made for literary purposes or for the education of white persons, and every gift, grant, devise or bequest which, since April tenth, eighteen hundred and sixty-five, has been or at any time hereafter shall be made for literary purposes or for the education of colored persons, and every gift, grant, devise or bequest made hereafter for charitable purposes, whether made in any case to a body corporate or unincorporated, or to a natural person, shall be as valid as if made to or for the benefit of a certain natural person, except such devises or bequests, if any, as have failed or become void by virtue of the seventh section of the act of the General Assembly passed on April second, eighteen hundred and thirty-nine, entitled "an act concerning devises made to schools, academies, and colleges." Nothing in this section shall be so construed as to give validity to any devise or bequest to or for the use of any unincorporated theological seminary. (Code 1919, sec. 587; 1954, c. 145.)

could not be validated under section 55–26. *A fortiori* the bequest herein cannot be validated under section 55–26.

Petitioner makes two additional arguments in a further effort to demonstrate that Fund C was a valid bequest under section 55–26.

Primarily, petitioner refers us to the case of *Fitzgerald* v. *Doggett's Ex'r*, 155 Va. 112, 155 S.E. 129 (1930), wherein a gift to the Virginia Conference, Methodist Episcopal Church, South, for the relief of superannuated ministers, was validated under section 55–26. Petitioner attempts to draw a comparison between the objectives of the gift in *Fitzgerald* v. *Doggett's Ex'r* and the objectives in Fund C. We find, however, that the objectives of these gifts are not similar. The gift in the instant case is for missionary work and there is no question that some part of this missionary work will be of a sectarian nature. The gift in *Doggett*, however, although for the relief of superannuated ministers, was primarily to provide financial support for a specific class of people. The fact that these people were ministers does not lead to a conclusion that the objectives of the gift in *Doggett* are similar to the objectives of Fund C in the instant case.

In further support of his contention that Fund C was a valid bequest under section 55–26, petitioner urges us to adopt the conclusion of the order issued by the Hustings Court of the City of Richmond, Part II, in *Carole Lee Handley versus Leonard Abrams*, wherein said court approved a compromise settlement and stated: "Now, therefore, the Court being of the opinion that the trusts involved herein are good and valid charitable trusts doth so adjudge and decree."

Although the decision of a State trial court is not binding on this Court, *Commissioner* v. *Estate of Bosch*, 387 U.S. 456 (1967), we have in certain circumstances accepted the determination of a State trial court, believing that it is clearly correct. *Harold S. Smith*, 50 T.C. 273, 282 (1968). We do not believe, however, under the facts of the instant case and the nature of the proceeding in the Hustings Court, that we should adopt that court's "opinion" that Fund C was a charitable trust, and we do not do so. The proceedings therein were composed entirely of a complaint, an answer and preliminary motions; moreover, the order was issued as a result of a court-approved compromise settlement. In short, a trial on the merits was never held.

Petitioner contends, in the alternative, that section 57–16 [7] of the Virginia Code validates the gift of "Fund C" and that at the time of decedent's death, there was no limitation in section 57–16 upon the amount of money or securities that the bishop could take or hold for diocesan purposes.

---

[7] Sec. 57–16. Property held, etc., by ecclesiastical officers.—(1) *How property acquired, held, transferred, etc.*—Whenever the laws, rules or ecclesiastic polity of any church or religious sect, society or denomination commits to its duly elected or appointed bishop, minister or other ecclesiastical officer, authority to administer its affairs, such duly elected or appointed bishop, minister or other ecclesiastical officer shall have power to acquire by deed, device, gift, purchase or otherwise, any real or personal property, for any purpose authorized and permitted by its laws, rules or ecclesiastic polity, and not prohibited by the laws of Virginia, and the power to hold, improve, mortgage, sell and convey the same in accordance with such laws, rules and ecclesiastic polity, and in accordance with the laws of Virginia.

(2) *Transfer, removal, resignation or death of ecclesiastical officer.*—In the event of the transfer, removal, resignation or death of any such bishop, minister, or other ecclesiastical officer, the title and all rights with respect to any such property shall pass to and become vested in his duly elected or appointed successor immediately upon election or appointment, and pending election or appointment of such successor, such title and rights shall be vested in such person or persons as shall be designated by the laws, rules, or ecclesiastic polity of such church or religious sect, society or denomination.

(3) *Validation of deeds, etc.*—All deeds, deeds of trust, mortgages, wills or other instruments made prior to March eighteenth, nineteen hundred and forty-two, to or by a duly elected or appointed bishop, minister or other ecclesiastical officer, who at the time of the making of any such deed, deed of trust, mortgage, will or other instrument, or thereafter, had authority to administer the affairs of any church or religious sect, society or denomination under its laws, rules or ecclesiastic polity, transferring property, real or personal, of any such church or religious sect, society or denomination, are hereby ratified and declared valid. All transfers of title and rights with respect to property, prior to such date from a predecessor bishop, minister or other ecclesiastical officer who has resigned or died, or has been transferred or removed, to his duly elected or appointed successor, by the laws, rules or ecclesiastic polity of any such church or religious sect, society or denomination, either by written instruments or solely by virtue of the election or appointment of such successor, are also hereby ratified and declared valid.

(4) *Insufficient designation of beneficiaries or objects of trust.*—No gift, grant, bequest or devise made on or after March eighteenth, nineteen hundred and forty-two, to any such church or religious sect, society or denomination or the duly elected or appointed bishop, minister or other ecclesiastical officer authorized to administer its affairs, shall fail or be declared void for insufficient designation of the beneficiaries in, or the objects of, any trust annexed to such gift, grant, bequest or devise; but such gift, grant, bequest or devise shall be valid; provided that whenever the objects of any such trust shall be undefined, or so uncertain as not to admit of specific enforcement by the chancery courts of the Commonwealth, such gift, grant, bequest or devise shall be held, managed, and the principal or income appropriated, for the religious and benevolent uses of such church or religious sect, society or denomination by its duly elected or appointed bishop, minister or other ecclesiastical officer authorized to administer its affairs.

(5) *Limitation on amount of land to be held.*—This section shall not be construed, however, so as to authorize any parish or congregation of such church to hold more than four acres of land in any one site or place, at any one time, in any incorporated city or town, or more than seventy-five acres outside of a city or town and within the same county.

(6) *Rights and remedies cumulative.*—The rights created and the remedies provided in this section shall be construed as cumulative and not exclusive.

(7) *No implied repeal of other provisions.*—This section shall not be so construed as to effect an implied repeal of any other provisions of this chapter. (1942, p. 382; Michie Code 1942, Sec. 38a.)

278

It is respondent's contention, however, that section 57–12 [8] which is directed to lay trustees and which contained at decedent's death a $2 million limitation on the amount of personalty said trustees (of a church or religious congregation or society) could hold, is applicable to transfers under section 57–16; that as a result of this limitation, the bishop may not hold more than $2 million of personalty for the diocese; and that petitioner's construction of section 57–16 would render the section unconstitutional.

We agree with petitioner.

We note that decedent's gift of "Fund C" is to the bishop for "missionary purposes of the Diocese of Richmond" and not to the bishop for the benefit of a specific church or parish within the diocese. Section 57–7 [9] validates transfers to lawful trustees of a church or religious congregation, subject to the limitations imposed by section 57–12; which section in 1962 imposed a limitation in the sum of $2 million

[8] Sec. 57–12. Such trustees shall not take or hold at any one time more than four acres of land in a city or town, nor more than seventy-five acres outside of a city or town and within the same county; provided that the city or town council of any city or town may by ordinance authorize such trustees to take and hold in such city or town not exceeding ten acres of land at any one time if such acreage is to be devoted exclusively, and is subsequently so devoted, to a church building, chapel, offices exclusively used for administrative purposes of the church, a Sunday-school building and playgrounds therefor, and parking lots for the convenience of those attending any of the foregoing, and a church manse, parsonage or rectory; and they shall not take nor hold at any one time, money, securities or other personal estate exceeding in the aggregate, exclusive of the books and furniture aforesaid, the sum of two million dollars; provided, that where two or more religious congregations, churches or religious societies shall merge or consolidate, such religious congregation, church or religious society so merged or consolidated, shall have three years' time within which to dispose of its land in excess of that which it is permitted to hold under this section.

Nothing herein contained shall affect the validity of any land within a city or town legally acquired by a church to be exclusively used for a church manse, parsonage or rectory between the effective date of section 57–12 of the Code of Virginia as amended in Chapter 309 of the 1954 Acts of Assembly and the effective date of this section, provided the total amount of land owned by a church within a city or town does not exceed ten acres.

This section, as amended, shall not be construed as applying to any property which is the subject of litigation at the time of or prior to the effective date hereof; and shall not, in any such litigation, be construed as evidencing any change in any legislative policy respecting any matter or matters covered by this article.

[9] Sec. 57–7. What transfers for religious purposes valid.—Every conveyance, device, or dedication shall be valid which, since the first day of January, seventeen hundred and seventy-seven, has been made, and every conveyance shall be valid which hereafter shall be made of land for the use or benefit of any religious congregation as a place for public worship, or as burial place, or a residence for a minister, or for the use or benefit of any church, or religious society, as a residence for a bishop or other minister or clergyman who, though not in special charge of a congregation, is yet an officer of such church or religious society, and employed under its authority and about its business; and every conveyance shall be valid which may hereafter be made, or has heretofore been made, of land as a location for a parish house or house for the meeting of societies or committees of the church or others for the transaction of business connected with the church or of land as a place of residence for the sexton of a church, provided such land lies adjacent to or near by the lot or land on which is situated the church to which it is designed to be appurtenant, and the land shall be held for such uses or benefit and for such purposes, and not otherwise. And no gift, grant, or bequest hereafter made to such church or

on the amount of personalty said trustees of a church could hold. In construing section 57–7, the Virginia Supreme Court of Appeals has held that "church or religious congregation" means only the local congregation and not the church at large in its denominational sense. *Moore* v. *Perkins, supra* at 807–809, and cases there cited. Thus, section 57–12, which provides for limitations on the amount of a gift to trustees of a church or religious congregation, is applicable only to the local congregation and not to the church at large in its denominational sense.

Section 57–16, however, which also validates religious transfers, confers authority to hold property not on trustees but upon a "duly elected or appointed bishop, minister or other ecclesiastical officer." Unlike the related sections 57–7 and 57–12, section 57–16 did not at the time of decedent's death impose a limitation on the transfer of personal estate,[10] and neither now nor then did this section speak only in terms of a "church or religious society" as did section 57–7 [11] at the time of decedent's death.

Subsection (1) of section 57–16 provides:

Sec. 57–16. Property held, etc. by ecclesiastical officers.—(1) *How property acquired, held, transferred, etc.*—Whenever the laws, rules or ecclesiastic polity of any church or religious sect, society or denomination commits to its duly elected or appointed bishop, minister or other ecclesiastical officer, authority to administer its affairs, such duly elected or appointed bishop, minister or other ecclesiastical officer shall have power to acquire by deed, devise, gift, purchase or otherwise, any real or personal property, for any purpose authorized and permitted by its laws, rules or ecclesiastic polity, and not prohibited by the laws

religious congregation, or the trustee thereof, shall fail or be declared void for insufficient designation of the beneficiaries in, or the objects of, any trust annexed to such gift, grant, or bequest in any case where lawful trustees of such church or congregation are in existence, or the congregation is capable of securing the appointment of such trustees upon application as prescribed in the following section; but such gift, grant, or bequest shall be valid, subject to the limitation of section 57–12; provided, that whenever the objects of any such trust shall be undefined or so uncertain as not to admit of specific enforcement by the chancery courts of the Commonwealth, then such gift, grant, or bequest shall inure and pass to the trustees of the beneficiary congregation, to be by them held, managed, and the principal or income appropriated for the religious and benevolent uses of the congregation, as such trustees may determine, by and with the approval of the vestry, board of deacons, board of stewards, or other authorities which, under the rules or usages of such church or congregation, have charge of the administration of the temporalities thereof.

Provided that any device of property after January one, nineteen hundred fifty-three, for the use or benefit of any religious congregation, wherein no specific use or purpose is specified shall be valid. (Code 1919, sec. 38; 1954, c. 268; 1956, c. 611.)

[10] Subsec. (5) of sec. 57–16 was amended in 1966 to read:

"This section [57–16] shall not be construed, however, so as to authorize any parish or congregation of such church to hold more land, money, securities or other personal estate than authorized under the provisions of sections 57–12, as amended from time to time."

[11] On March 31, 1962, the Virginia legislature amended secs. 57–7 and 57–12 by adding: (A) To sec. 57–12 the clause "and provided further that the trustees of a church diocese may take or hold not more than two hundred fifty acres in any one county at any one time;" and (B) to 57–7 various references to "church diocese." No limitation was imposed on the amount of personalty that a church diocese could take and hold.

of Virginia, and the power to hold, improve, mortgage, sell and convey the same in accordance with such laws, rules and ecclesiastic polity, and in accordance with the laws of Virginia.

On balance, we believe that section 57–16 was enacted to provide an acceptable alternative for those denominations that found lay trusteeship objectionable. See McGrath, Catholic Institutions in the United States: Canonical and Civil Law Status 2, 23, 24 (1968). Furthermore, we believe that section 57–16 was meant to be applicable not only to the acquisition of property for the local church or parish within a diocese but also for the diocese itself. We base this conclusion on the fact that throughout subsections (1) (How property acquired, held, transferred, etc.); (3) (Validation of deeds, etc.); and (4) (Insufficient designation of beneficiaries or objects of trust), reference is made to "any church, or religious sect, society or denomination," whereas section 57–7, at the time of decedent's death, spoke only of "any church, or religious society"—which in turn was construed to mean the local congregation rather than the denomination. See *Moore* v. *Perkins, supra.*

Moreover, subsection (5) of 57–16 imposing limitations on the amount of land to be held refers only to "any parish or congregation." We agree with respondent that the limitation on personalty found in section 57–12 was implied in the operation of section 57–16 at the time of decedent's death, however, we do not agree with respondent that the bishop when holding personalty for the diocese is subject to the limitations of section 57–12.

Subsection (1) of 57–16 provides that property could be acquired for "any purpose * * * not prohibited by the laws of Virginia," and subsection (7) provides: "This section shall not be so construed as to effect an implied repeal of any other provisions of this chapter." As noted above, sections 57–7 and 57–12 at the time of decedent's death referred only to the local congregation and not to a larger religious unit—such as a diocese or denomination. Accordingly, we conclude, as a result of both subsection (1) and subsection (7) in section 57–16, that when the bishop, as an ecclesiastical officer as provided in section 57–16, holds personalty for a specific congregation or parish he is subject to the limitations of section 57–12.

At the time of decedent's death sections 57–7 and 57–12 did not impose limitations upon the amount of personalty that could be held for a diocese. Respondent, however, urges upon us such a limitation for section 57–16, arguing that to construe section 57–16 otherwise would be to create an advantage in favor of those religions having a centralized ecclesiastical structure as compared to religions having a congregational ecclesiastical structure and that petitioner's construc-

tion of section 57–16 would render said section unconstitutional. Respondent's argument is antithetical.

Denominations governed by the provisions of sections 57–7 and 57–12 may still take and hold property above the congregational level, through corporate agencies. *Trustees Gen. Assem. Presbyterian Church U.S.* v. *Guthrie, supra* at 322 (86 Va. 125, 10 S.E. 318 (1889)). Those denominations referred to in section 57–16, however, cannot utilize the normal corporate form because of their ecclesiastical polity. Therefore, the only alternative would be for the property to be held by an ecclesiastical officer and, if we were to give credence to respondent's argument, it would mean that the later denomination, at the diocesan level, could take and hold only $2 million of personalty, while their brothers of the cloth in other denominations could take and hold more than $2 million at the diocesan level, through the use of corporate agencies. Accordingly, we find and hold that the gift to the Diocese of Richmond was a valid gift under the laws of Virginia and therefore petitioner, as an executor of the Estate of Florence H. Lawler, was correct in claiming a charitable deduction from decedent's Federal estate tax.

We thus hold for petitioner on the severed issue. The remaining issues in this docket, which are the value of certain stocks and bonds held by the decedent at her death and the amount of deductible administrative expenses, will be set for trial by further order of this Court.

> *The parties are directed to move with respect to further proceedings in this case, or otherwise act, on or before August 1, 1969.*